1  NATHAN GOLDBERG, SBN 61292
   JOHN S. WEST, SBN 102034
2  Law Offices
3  **ALLRED, MAROKO & GOLDBERG**
   6300 Wilshire Boulevard, Suite 1500
4  Los Angeles, California 90048
   Telephone No: (323) 653-6530
5  Fax No: (323-653-1660

6  **Attorneys for Plaintiff, Shelley Freeman**

7

8         IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9                                    CALIFORNIA

10

11 SHELLEY FREEMAN,                    )  CASE NO:
                                       )
12              Plaintiff,             )  **COMPLAINT FOR DEFAMATION,**
                                       )  **VIOLATION OF SECTION 1050 AND**
13       vs.                           )  **SECTION 1054 OF THE LABOR**
                                       )  **CODE, AND INVASION OF PRIVACY.**
14 WELLS FARGO & COMPANY, WELLS        )
   FARGO BANK, N.A.,                   )  **DEMAND FOR TRIAL BY JURY**
15                                     )
16              Defendants.            )
                                       )
17 _____ )

18

19     Plaintiff Shelley Freeman, an individual, hereby alleges and complains against Defendants

20 Wells Fargo & Company and Wells Fargo Bank, as follows:

21 **I.   PARTIES, JURISDICTION AND VENUE**

22     1.      Plaintiff Shelley Freeman (hereinafter referred to as "Plaintiff") is a citizen of the

23 United States and a resident of the State of Florida.

24     2.      Defendant Wells Fargo & Company ("WFC") is a publicly traded financial

25 services corporation, organized and existing under the laws of the State of Delaware, with its

26 principal place of business in San Francisco, California.

27     3.      Wells Fargo Bank, N.A. ("WFB") is a National Bank and a wholly owned

28 subsidiary of WFC, with its primary place of business in Sioux Falls, South Dakota.  WFB is

WFC's principal subsidiary. WFB's largest business unit is known as the Community Bank ("CB").  At all times relevant hereto, Wells Fargo's Community Bank was responsible for customers' checking and savings accounts, certificates of deposit, debit cards, credit cards, etc. through Wells Fargo's network of branches.

4.     Unless indicated otherwise, the term "Wells Fargo Defendants" or "Wells Fargo" as utilized hereinafter shall collectively refer to WFC and WFB, unless otherwise specified.

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that this is an action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b)(2)(b) in that a substantial part of the events giving rise to the claim, including actions taken by Wells Fargo, occurred in this judicial district.

## II. <u>STATUTE OF LIMITATIONS TOLLED ON PLAINTIFF'S CLAIMS</u>

7.     The claims asserted in this complaint are timely as of the date of the filing of this lawsuit pursuant to a written tolling agreement among the parties.

## III. <u>FACTUAL INTRODUCTION</u>

8.     From 2013-2017 Wells Fargo was in crisis.  The Bank was caught selling unwanted, unneeded products to its customers and opening millions of unauthorized accounts. The Bank agreed to pay the City of Los Angeles, the OCC, and the Consumer Financial Protection Bureau one hundred eighty five million dollars in fines and agreed to take corrective actions as set forth in the settlement with the City and in consent orders with governmental agencies. Regulators and customers were incensed.   Congress conducted hearings regarding the Bank's failures, excoriating its CEO. Wells Fargo conducted internal investigations and hired outside consultants to determine what went wrong. In its effort to manage the fallout from the scandal, Wells Fargo, without regard to the truth, labeled Plaintiff as one of the parties responsible for the scandal. In doing so the Bank ignored massive amounts of information in its own records which proved otherwise. The Bank maliciously defamed Plaintiff worldwide,

destroying Plaintiff's reputation, making it impossible for Plaintiff to continue her stellar banking career.   Wells Fargo chose to tar and feather Plaintiff, without cause, to protect others.

9.     If there is such a thing as a perfect record, Plaintiff had it.

10.    From 2002 to 2008, Plaintiff was Wells Fargo's Regional President in Los Angeles.  In that position she received outstanding performance reviews each year.  These reviews evaluated every aspect of her management, concluding that she always ran a safe and sound banking operation, while complying with all laws and regulations and the policies and procedures of the Bank. Plaintiff's reviews highlighted her focus on always doing what was right for customers.

11.    In January 2009, Plaintiff was promoted to the position of Lead Regional President of Florida, the largest and most troubled region of newly acquired Wachovia Bank.

12.    As she did in Los Angeles, Plaintiff communicated prolifically with her Florida team, exhorting them to adhere to Wells Fargo's Vision and Values, to always do what was right for customers, and provide only what customers needed.

13.    During her tenure in Florida, Plaintiff continued to receive outstanding performance reviews.

14.    In 2013, Plaintiff was named head of Customer Experience for retail banking and was also selected by Wells Fargo's Chief Administrative Officer to co-lead a Culture of Caring initiative which was designed to educate employees throughout the Bank to ensure that they understood and adhered to Wells Fargo's Vision and Values.

15.    In October of 2013 the Los Angeles Times published its first article regarding the sales practices scandal at Wells Fargo Bank. Los Angeles became known as the epicenter of simulated funding, the most well-known aspect of the sales practice failures at Wells Fargo Bank. These abhorrent sales practices surfaced in Los Angeles/Orange County almost five years after Plaintiff had left Los Angeles to assume her position in Florida.  Plaintiff had never had responsibility for Orange County.  There was no evidence that simulated funding existed in the Los Angeles region while Plaintiff was its Regional President.

16.     In 2017, in a desperate attempt to create a scapegoat for the simulated funding scandal in Los Angeles and Orange County, Wells Fargo targeted Plaintiff without cause, without evidence and contrary to the information which Wells Fargo had in its possession. Wells Fargo turned Plaintiff from a private person with an impeccable reputation into a pariah, worldwide.  Anyone googling her name will see almost a million hits associated with the scarlet letter that Wells Fargo placed on Plaintiff's back.

17.     This lawsuit is intended to remove the scarlet letter and the stain that Wells Fargo placed on Plaintiff's good name so cavalierly and seeks compensation for the devastation that Wells Fargo caused.

**IV. WELLS FARGO**

18.     Upon information and belief, Plaintiff alleges that Defendants WFC and WFB, were agents, partners, and/or otherwise associated with one another in such a manner  to have caused, ratified, authorized, whether directly or indirectly, and/or otherwise contributed to the Plaintiff's damages as herein alleged.  As such, Plaintiff alleges that the Wells Fargo Defendants are jointly, severally and/or vicariously liable to Plaintiff for her damages based on *respondeat superior*, or agency (actual, implied, or apparent).

19.     The Wells Fargo Defendants offered bank accounts and various financial products to customers within its retail bank branches (also referred to as "stores").

20.     WFB's Community Bank managed Wells Fargo's branches which employed various employees, including tellers who processed basic banking transactions and Wells Fargo bankers who were responsible for offering Wells Fargo accounts and other financial products to customers.

21.     From 2002 to 2016, Carrie Tolstedt oversaw Wells Fargo's Community Bank. In that capacity, Ms. Tolstedt reported directly to WFC's Chief Executive Officer (CEO).

**V. WELLS FARGO'S AGGRESSIVE "CROSS-SELL" MODEL**

22.     Beginning in 1998, after its merger with Norwest Bank, Wells Fargo adopted a "cross-sell" strategy which formed a core part of its sales model.  Wells Fargo's strategy incentivized its employees to sell additional financial products to Wells Fargo's existing

customers. The basic concept was to increase profits by increasing the number of Wells Fargo products (solutions) per customer.  Wells Fargo strived for eight Wells Fargo products per household.  The Wells Fargo products promoted for "cross-sell" included checking accounts, savings accounts, credit cards, debit cards, etc. Wells Fargo measured the number of products per retail banking household using a "cross-sell" ratio.

23.     Wells Fargo structured its core sales strategy on maximizing cross-sell and increasing the cross-sell ratio. Wells Fargo's CB executed this strategy through its sales planning, the way Wells Fargo sold its products, and how it incentivized its bankers to sell these products.

24.     Wells Fargo included its cross-sell ratio in every annual filing from 1998 to 2015, underscoring its importance. Additionally, Wells Fargo published a "cross sell metric" in its annual reports and SEC forms that purported to be the ratio of the number of accounts and products per retail bank household. The Wells Fargo Defendants touted to investors the consistent growth of the cross-sell metric as demonstrative of its success at executing its cross-selling strategy.

25.     Wells Fargo also featured cross-sell in its internal communications.  At Wells Fargo, the cross-sell number was considered the "holy grail" that its employees were encouraged to aggressively pursue.

26.     Wells Fargo stated that its sales strategy was "needs-based" which meant Wells Fargo would only sell its customers products they needed. In its "Vision and Values", Wells Fargo states: "We start with what the customer needs not with what we want to sell them."

## VI. SHELLEY FREEMAN JOINS WELLS FARGO'S COMMUNITY BANK

27.     In 1996, Plaintiff left her employment with Lehman Brothers to join Wells Fargo.

28.     Initially Plaintiff worked at Wells Fargo's brokerage and private banking departments. In late 1999, Plaintiff began working with Wells Fargo internet services group, where she was responsible for building institutional and retail investment capabilities on the internet.

29.     In 2002, WFC's then COO, John Stumpf, actively recruited Plaintiff to join the Community Bank as Regional President in charge of its Los Angeles Metropolitan region (encompassing Los Angeles, Santa Barbara, Ventura, and parts of San Bernardino County). Wells Fargo chose Plaintiff to lead the Los Angeles Region, even though, at the time, she had no experience in retail banking.  In recruiting Plaintiff for this position, Mr. Stumpf told Plaintiff that he thought she was the right person to raise the level of professionalism of its bankers so they could deliver a broader array of Wells Fargo products and services to its Los Angeles stores.  He stated that, under Plaintiff's leadership, Los Angeles could become a model for other Wells Fargo regions in the United States.  Mr. Stumpf wanted Plaintiff to advance the skill set of Wells Fargo bankers, enable them to profile their customers, understand their customers' financial needs, and thus be positioned to recommend banking and investment solutions to Wells Fargo customers to meet those needs.

30.     The Community Bank that Plaintiff joined was an aggressive sales organization.

31.     Wells Fargo Community Bank's fundamental business model in Los Angeles was to grow the business by increasing the number of branches and salespeople while increasing their productivity, i.e., "*more people selling and people selling more*."

32.     The period during which Plaintiff was Regional President of the Los Angeles region was a period of rapid expansion during which 70 branches ("stores") were added over five (5) years and the number of Wells Fargo bankers more than doubled from approximately 1,000 bankers to approximately 2,100 bankers.

33.     Double-digit sales growth was relatively easy to achieve given the new products and services being offered, the increase in salespeople, and the increased number of branches.

34.     During Plaintiff's tenure as Regional President of the Los Angeles region, Plaintiff devoted herself to elevate the professionalism of team members in the Wells Fargo branches.  Plaintiff installed a 16-week training program for bankers, which included securities licensing, and implemented a recruitment and talent assessment tool to improve hiring effectiveness.  Leading with integrity and improving the customer experience was at the

forefront of Plaintiff's communications with her team. She wanted leaders that embodied the "Vision and Values" that Wells Fargo espoused.

35.    For example, on May 6, 2004, Plaintiff wrote to her senior Wells Fargo leadership team as follows:

> "In order to build our assessment process, we need to identify some of our very best store managers. This is not simply about sales results. It is also about managers who drive both customer and team member engagement and are our future leaders. They would be people who lead with enormous integrity. Store mgrs. with large unfundeds don't fall into this category."

36.    Plaintiff and her team developed tools and processes to help its bankers and managers deliver on Wells Fargo's brand promise of "*our product is service, our value added is our financial advice*.  Plaintiff and her team developed and implemented the original Financial Client Worksheet ("FCW"), which was a customer needs assessment tool.  She set the expectation that the FCW would be used with every Wells Fargo customer. This approach was considered a best practice and later adopted throughout Wells Fargo's Community Bank in the form of the Customer Needs Assessment (CNA).

37.    In 2007, due to Plaintiff's success as Regional President in Los Angeles, Wells Fargo asked Plaintiff to lead an enterprise partnership to better serve its affluent customers.  (She continued in this capacity until she left Wells Fargo's Community Bank in 2014).

38.    In 2008, in the wake of the global financial crisis, Wells Fargo acquired Wachovia. In January 2009, Plaintiff was promoted to the position of Wells Fargo's Lead Regional President in Florida.

**VII.    IN HER POSITION AS REGIONAL PRESIDENT IN LOS ANGELES PLAINTIFF RECEIVED THE HIGHEST POSSIBLE PERFORMANCE REVIEWS**

39.     From 2002 to 2008, Wells Fargo repeatedly acknowledged Plaintiff's efforts in running a safe and sound banking operation in the Los Angeles region, as demonstrated by the following excerpts from Plaintiff's annual performance reviews:

(a) 2002: "She is very focused on leading with integrity which sometimes requires rough conversations and decisions.  I applaud her for never wavering in this regard."

(b) 2003: "Shelley has become a very accomplished and motivating sales leader in a very short timeframe. She leads the company in practically every area, which is great since she manages the company's largest Regional Banking region."

(c) 2003: "What can you say about minding the store metrics except WOW! Double-digit reductions in op losses in the fraud capital of America. Near perfect (99%) SOCR scores! This is a tremendous demonstration of how balanced Shelley, and her team were during 2003. They focused on all facets of the management pyramid and drove to breakthrough performance in each one! Well done!!!"

(d) 2003: "Perhaps the most satisfying accomplishment was watching Shelley be herself and win the confidence and loyalty of her team, her co-workers, her community board, and the community at large. Shelley followed a larger-than-life leader and was admittedly not yet an expert at community or retail banking or the unusual politics existing between silos and on the 12th floor. This did not stop her from coaching her team to an incredibly successful 2003 and setting the stage for perhaps unprecedented success in 2004! Shelley, thanks for all you have contributed to the success of L.A. Metro and its team. Thanks for all you have contributed to CABN and to Regional Banking."

(e) 2004: "Overall, Shelley is a motivating and inspiring sales leader."

(f) 2004: "Shelley ran a very safe and sound banking operation in 2004, which is critical, considering the size of her business relative to others in Regional Banking. … SOCR results were stellar with an overall 97% pass rate. While this may be stating the obvious, compliance, particularly in a high-risk market like LA, will be an essential focus with nearly zero tolerance for non-compliance.

(g) 2005: "Her objective was to work toward improving the professionalism of her team. She has led the way with forward hire programs at all levels, licensed bankers and store based private bankers. She invested more in coaching and skill building, which resulted in more solutions and the effectiveness and efficiency with which these were delivered to her customers."

(h) 2005: "There was a lot of focus on skill building and providing a more valuable customer experience through improved needs-based selling."

(i)  2005: "The key controllable areas here are SOCR exams, compliance, and operating losses. I appreciate Shelley and her team's ability to focus on all the compliance certifications and new processes introduced during 2005. None of these enhanced or made the bankers jobs easier, yet the L.A. Metro Region leadership helped the team through and still posted great solutions and revenue growth. Thank you for this focus when we really needed it. Shelley and her team did a terrific job in controlling operational processes in the stores as evidenced by the very high rate of success in passing the SOCR exams throughout the year. There isn't much to say here except keep up the great work!"

(j)  2006: "MINDING THE STORE SOCR surveys represented an area of significant success in 2006. Out of 231 SOCR surveys performed last year, there were zero receiving an unacceptable review. …. Compliance training completions was outstanding. Each four quarters certifications were above a combined completion rate of 99%. This is a new metric and focus for 2006 and I am very impressed with these kinds of results during the first year. Obviously, this is a very important initiative for Regional Banking, and I applaud the focus and results of the LA Metro Team!"

(k)  2006: "In summary, I'm not sure you and your team could have done anything different or better to demonstrate your commitment and achievement toward running a safe and sound banking operation. Thank you for "Minding the Store."

(l)  2007: "MINDING THE STORE.  The LA Metro team is very focused on running a safe and sound banking operation and excelled in most key metrics.  As noted in the self-assessment, SOCR and Compliance Certifications were flawlessly executed. … Thank you, Shelley, for another amazing year."

(m)  2008: "The Region continues to focus on its team members by conducting development, communication and recognition programs in order to improve team member engagement, performance and retention."

(n)  2008: "LA Metro again demonstrated solid operational practices around SOCR in 2008, meeting and exceeding the compliance metrics. The Region achieved 100% certifications 3 out of 4 quarters."

(o)  2008: "The region passed 99.2% of its 257 SOCRs in 2008."

(p)  2008: Laura Schulte, Plaintiff's Supervisor, wrote, "Thank you for your commitment to our vision and values."

**VIII. <u>SALES PRACTICE ISSUES DURING PLAINTIFF'S YEARS IN LOS ANGELES</u>**

40.     During Plaintiff's years as Regional President in Los Angeles, sales practice issues were immediately addressed when identified.  Sales practice issues primarily centered around debit cards for which the compensation plans rewarded bankers no matter how many were given to a single customer. Plaintiff repeatedly complained to Wells Fargo's senior management that its customers had little need for more than one debit card, and therefore Wells Fargo sales credit should only be given for one card.  Notwithstanding her protests, this policy, which incentivized bankers to deliver multiple debit cards, remained in effect during Plaintiff's entire tenure at Wells Fargo Community Bank.

41.     Plaintiff had "zero tolerance" for unfunded accounts.   Thus, Plaintiff advocated providing sales credit to bankers only when accounts funded, but more senior Wells Fargo Community Bank management disagreed and Wells Fargo continued to provide sales credit to its bankers for accounts that were opened, even if they were not funded.

42.     Wells Fargo's Community Bank tolerated a 90-93% funding rate for checking and a combined funding rate for checking and savings of 85%.

43.     Notwithstanding Wells Fargo's tolerance for unfunded accounts, Plaintiff made it known that she had zero tolerance for bankers in her region who opened checking accounts that were not funded.  For example, Plaintiff wrote to her team on August 10, 2007, as follows: "I want to remind you how important it is to fund our checking accounts. We can certainly tolerate some underfunded in savings, but we must have zero tolerance for being in the red on checking."

**IX. <u>WELLS FARGO'S MERGER WITH WACHOVIA</u>**

44.     Wells Fargo's rise to prominence as one of the United States "mega" or "super" banks occurred largely due to its acquisition of Wachovia Corporation ("Wachovia"). The global financial crisis of the late 2000's brought Wachovia to the brink of failure and the government

1   forced its sale. Prior to its merger with Wells Fargo, Wachovia was the fourth-largest bank

2   holding company in the United States.

3        45.   As a result of its merger with Wachovia, Wells Fargo grew to over 270,000

4   employees serving more than 70 million customers.

5   **X.  WELLS FARGO PROMOTED PLAINTIFF TO THE POSITION OF LEAD REGIONAL PRESIDENT IN FLORIDA**

6

7        46.   Following Wells Fargo's acquisition of Wachovia, Laura Schulte, who had been

8   Plaintiff's Supervisor the entire time that Plaintiff was Regional President for the Los Angeles

9   Region, was asked to take on the responsibility for Wells Fargo's East Coast operations.

10        47.   At the time, Florida was the largest Wachovia region and the most troubled

11   market in the east.  It was known as "ground zero for the nation's financial crisis from a real

12   estate perspective." Wells Fargo offered Plaintiff a promotion to the position of Lead Regional

13   President in Florida.  She was told that she was chosen because of her track record in Los

14   Angeles in building a culture that modeled Wells Fargo's Vision and Values.

15        48.   In January 2009, Plaintiff moved to Florida to assume her new position as Lead

16   Regional President for Florida.  When she left Los Angeles, Wells Fargo had 273 branches in the

17   Los Angeles region compared to more than 700 branches which she assumed responsibility for in

18   Florida.

19        49.   To assist her Florida leadership team, Plaintiff recruited a number of Wells Fargo

20   employees she had worked with in Los Angeles to join her in Florida.  Wells Fargo had no retail

21   bank presence in Florida prior to the Wachovia merger.

22        50.   When Plaintiff moved to Florida to assume her new duties, John Sotoodeh

23   succeeded her as Regional President for the Los Angeles region.  Sometime thereafter, Wells

24   Fargo added Orange County to Mr. Sotoodeh's region, which became known as the "LA/OC"

25   region.

26        51.   Throughout 2009 to 2011 Plaintiff focused her efforts on the conversions of

27   Wachovia's systems to Wells Fargo's systems, procedures, and products while promoting Wells

28

Fargo's "Vision and Values" amongst the former Wachovia employees, who became Wells Fargo employees as a result of the merger.

52.    Sales integrity training was required for all employees. On November 2, 2009, Plaintiff wrote, "This training is so important and will make sure everyone is positioned to be successful and do what is right for our customers and teams. We should never sell something to a customer that doesn't make sense for them".

53.    Plaintiff wrote to her senior Wells Fargo leaders, once or twice a week, reinforcing Wells Fargo's "Vision and Values". These "Motivators" were intended to inform team members of performance metrics progress on these metrics, discuss strategies and opportunities to cross-sell, highlight special promotions and emphasize Wells Fargo's Vision and Values.

54.    In these emails, Plaintiff repeatedly emphasized the importance of assessing the customer's needs, matching the right products and services to those needs - and only those products and services - and delivering a great customer experience. Plaintiff sent similar messages to her leadership team throughout her tenure as Regional President in Los Angeles.

55.    During these early years after the Wachovia merger, the number of Wells Fargo's bankers in Florida nearly doubled.

56.    By 2012, the integration of Wachovia branches to Wells Fargo was completed as reflected in comments made by Carrie Tolstedt at the Wells Fargo Investor Day Conference on May 22, 2012, as follows:

> "As you know, we completed the integration in February. Our coast-to-coast retail banking network, located in more markets with more stores and retail Deposit share than any other bank, is completely Branded Wells Fargo and linked together on common Systems and platforms. The scale and complexity of this Integration was like no other. What's more, the retail Customer base of Wachovia really liked Wachovia. The company served one of the most loyal retail customer bases in the industry. We had to get this right and took nothing for granted.  Our focus was to ensure our new customers were so satisfied they became even more loyal once they officially converted to Wells Fargo. We understood that winning the hearts and minds of our new team members was job one. We had a goal to grow customers and earn more of their business through the integration process. We needed to introduce the Wells Fargo brand to new markets and build a solid Reputation, during a challenging time for bank reputations. And we had to lay a foundation for future growth. I'm proud to say we accomplished all these Objectives.

And as a result, we experienced growth through the conversion including nearly 1.7mm additional retail bank households, cross-sell now approaching 6.0, up from around 5.2 at time of the merger, strong deposit and solutions growth while at the same time maintaining high quality customer service levels."

## XI. AS WELLS FARGO'S LEAD REGIONAL PRESIDENT IN FLORIDA, PLAINTIFF SHOWED NO TOLERANCE FOR IMPROPER SALES PRACTICES

57.     In July 2009, a sales quality analysis identified some questionable debit card transactions in Florida. Some stores in Plaintiff's region were flagged for selling a high number of debit cards relative to checking accounts. In an email dated July 13, 2009, Plaintiff instructed her team to investigate these issues and told them she had zero tolerance for "gaming" (manipulating the incentive system for personal gain or cheating to achieve sales goals).  She wrote, "Clearly, we have some people in our system that are not focused on helping customers succeed, but instead on helping themselves. We have no tolerance for this."

## XII.     AFTER PLAINTIFF MOVED TO FLORIDA, SUBSTANTIAL CHANGES OCCURRED AT WELLS FARGO'S COMMUNITY BANK

58.     While Plaintiff was Regional President in Los Angeles, Wells Fargo's sales goals for the region, division, district, and branches were set through a highly collaborative process. For example, Plaintiff worked with her team to develop sales goals for the region on a branch-by-branch basis. It was a "bottoms-up" approach in which sales goals were based on what each branch believed would be achievable.  District managers were provided with plans for the following year along with the tools and information that they needed to assess their staffing needs and establish a sales plan. The District Managers, in consultation with their store managers and Division Managers, would consider growth opportunities, new product opportunities, and the addition of new locations in arriving at a detailed sales plan. The plans were then rolled up and approved by Plaintiff, in consultation with her leadership team, and ultimately by her superiors within Wells Fargo's Community Bank. These sales goals were agreed upon and designed to be achievable.  They also created accountability because those responsible for meeting these goals were part of the process by which the goals were established.

59.     After Plaintiff moved to Florida, Wells Fargo's sales goals changed to a "top-down approach." in which sales goal planning was centralized and became detached from the

financial plan and what could realistically be achieved. Goals for each region were handed down by Carrie Tolstedt and her senior management team at Wells Fargo's Community Bank without substantial input from Wells Fargo's Regional Presidents.

60.     Starting in 2009 and continuing in 2010 and 2011, the Wells Fargo regions were given unrealistic sales goals. Complaints by regional leaders about these unattainable sales goals were ignored.  Moreover, those who complained were often ridiculed, belittled, and bullied because of their complaints by senior Wells Fargo management.

61.     Plaintiff was one of the regional leaders who was most vocal in complaining that the sales goals were unrealistic and unachievable. For example, in 2012, when the Florida region was given a sales goal which Plaintiff believed was unachievable, Plaintiff objected vociferously. On May 2, 2013, in a meeting with senior management of Wells Fargo's Community Bank in attendance, Plaintiff argued that the sales goals were unrealistic, but senior management refused to lower the sales goals.

62.     When Plaintiff was Regional President in Los Angeles, Wells Fargo bankers trained for 16 weeks prior to being allowed to work in a store. Similarly, Wachovia's pre-merger hiring and training practices included a sixteen (16) week training program. After the merger, however, Wells Fargo reduced the training period for bankers to 16 days.

63.     Starting in 2009. Wells Fargo dismantled its previous hiring and training practices to get bankers working in stores as quickly as possible.  Wells Fargo's Community Bank began hiring high school graduates and then unleashed them on the stores, although they were poorly trained and ill-equipped to be bankers. Plaintiff consistently objected to Wells Fargo's reduced investment in training and the recruitment of unskilled, under-trained bankers.

64.     As poorly trained bankers attempted to achieve sales goals that were not achievable, sales practice violations increased throughout the Community Bank.

65.     Florida had the lowest cross-sell of all the Eastern regions.  To increase Florida's cross-sell, Laura Schulte chastised Plaintiff because Florida did not sell as many debit cards as other regions due to Plaintiff's adamant refusal to allow team members in Florida to sell customers debit cards that they did not need.

66.     As a result of the changed environment at Wells Fargo's Community Bank, Plaintiff became demoralized and despondent. Starting in 2012, Plaintiff told Ms. Schulte and Ms. Tolstedt that she no longer wanted to work in the retail bank. She continued to express her desire to leave the retail bank until August 2013 when Plaintiff was offered and accepted a new position which did not involve managing Wells Fargo's retail branches.

67.     In October 2013, Plaintiff assumed her new duties as Wells Fargo's Customer Experience Executive for retail banking.

**XIII.     SALES INTEGRITY ISSUES DURING 2011-2013**

68.     On August 20, 2011, Marty Weber sent a Corporate Investigations Sales Integrity Report to Wells Fargo's Community Bank's senior management reflecting the high number of sales integrity cases then existing.  The west coast had 480 sales integrity cases.  By contrast, Florida, with half as many branches as the west coast, had 90 sales integrity cases.

69.     In 2012, Wells Fargo's Community Bank adopted several new initiatives and measures intended to monitor and improve sales quality and moved Sales and Service Conduct Oversight Team (SSCOT) to its Group Risk Officer.

70.     In January 2012, Wells Fargo's Community Bank published a new Sales Quality Manual which was required reading for all its retail banking team members.

71.      In April 2012, Wells Fargo Community Bank launched the Quality of Sales Report Card ("QSRC").

72.     On June 12, 2012, Ken Zimmerman sent an email to all Wells Fargo Regional Presidents stating that they were in the process of identifying Wells Fargo retail stores where team members were improperly opening two bank accounts for customers and having an auto transfer to fund one account from another.

73.     On June 19, 2012, Mr. Zimmerman circulated a list of more than 450 Wells Fargo stores where this prohibited practice of "simulated funding" – defined as the improper manipulation of funds in and out of accounts - was occurring most frequently.  There were 13 stores identified in Florida, or about 2% of the stores, compared to 27 stores in the LA/OC Region, representing about 10% of Wells Fargo stores in that Region.

74.    In July 2012, Wells Fargo's Community Bank issued a report regarding the quality of sales throughout the regions. A score of 3 or more was an acceptable score. All the Florida regions had scores of 3 or better. Plaintiff's Florida regions remained above the threshold throughout Plaintiff's remaining tenure in Florida.

75.    Plaintiff continued to emphasize quality and meeting customer needs to her team. On November 26, 2012, Plaintiff wrote to her team:

"Helping our team members do what they do best every day and learn and grow in their current role is how we help them excel. By encouraging them and supporting them with coaching, feedback, and recognition, we are able to engage them and keep them energized so they can better help our customers and each other."

In 2013, Plaintiff wrote to her leadership team as follows:

"Sales quality is the foundation of everything we do. When we talk about 'sales quality' it means opening the right accounts that our customers need and not one more." …., you can help your team members achieve success by making sure everyone on your team is doing the right thing for our customers every day."

## XIV.    IN JULY 2013, SIMULATED FUNDING IN THE LA/OC REGION WAS HIGHLY DISPROPORTIONATE TO OTHER REGIONS IN THE COMMUNITY BANK.

76.    On July 2, 2013, an email was sent by Kyle Jackson, West Coast Risk Management, to Lisa Stevens, Regional President for the West Coast and John Sotoodeh, amongst others, advising them as follows:

"A while back I communicated to you some emerging sales quality trends, one of which was simulated funding. Simulated funding, as defined by Sales Quality, is funding one account, and then transferring those same funds between other accounts for the sole purpose of meeting funding requirements.  Sales Quality recently looked at funding based on recent trends and identified potential simulated funding. Based on the report:
- 11.26% of accounts that are funded in West Coast are done so using simulated funding (vs 6.82% for regional banking) and approximately 60% of those accounts are closed within 90 days.
- 4.75% of accounts funded in West Coast have money go in and out within 1 day of opening and no additional transactions resulting in a zero balance at the end of the 60 day RFR period (vs 2.56% for regional banking).

**XV.** **WELLS FARGO LAUNCHED AN INVESTIGATION REGARDING SIMULATED FUNDING AND OTHER IMPROPER PRACTICES IN IN THE LA/OC REGION.**

77.     In the summer of 2013, Wells Fargo's Sales and Service conduct Oversight Team (SSCOT) determined that the highest concentration of simulated funding was occurring in Wells Fargo's LA/OC region.

78.     SSCOT identified 177 Wells Fargo team members in the LA/OC region as potentially engaging in simulated funding.  25 employees were identified as engaging in simulated funding most egregiously.  These employees worked at branches located in the San Fernando Valley.

79.     Information concerning these 25 team members was conveyed to Corporate Investigations, (CSI), which is part of Wells Fargo's Corporate Security group, responsible for investigating allegations of misconduct by team members.  Their investigation also included team members allegedly changing customer phone numbers so that Wells Fargo would be unable to conduct customer satisfaction surveys.

80.     A task force of investigators conducted interviews. The first round of LA/OC interviews, completed in late September/ October 2013, resulted in 30 terminations.

81.     On October 9, 2013, the results of the investigation were reported to Claudia Russ Anderson, Group Risk Officer, John Sotoodeh, Regional President LA/OC, and Lisa Stevens by a Significant Investigation Notification (SIN) memo.

82.      A second round of LA/OC interviews resulted in 22 additional terminations of team members for engaging in simulated funding and/or or changing customer phone numbers. Under findings, it was noted: "Management instructed them that it was acceptable."

83.     On information and belief, Plaintiff alleges that there was no follow up by Wells Fargo to ascertain which management employees instructed team members that simulated funding and/or changing customers' phone numbers were acceptable practices.

84.     Wells Fargo's senior management were made aware of these additional terminations and the surrounding circumstances through an update to the initial October 9, 2013,

SIN memo.

85.     Following this initial investigation in the LA/OC region, WFB's group risk officer conducted a nationwide search to determine whether simulated funding and/or changing customer phone numbers was occurring elsewhere in the Community Bank.  This nationwide analysis resulted in 39 additional terminations for simulated funding abuses.   Plaintiff's Florida regions did not have any team members identified or terminated for simulated funding.

## XVI.     THE LOS ANGELES TIMES PUBLISHED A STORY REGARDING EMPLOYEES IN THE LA/OC REGION ENGAGING IN STIMULATED FUNDING AND ACCOUNT MANIPULATION

86.     On October 3, 2013, the Los Angeles Times published an article entitled "Wells Fargo fires workers accused of cheating on sales goals", describing the firing of "about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used and attempted to manipulate customer-satisfaction surveys." The article referred to employees being placed under intense pressure to meet sales goals.

87.     The Los Angeles Times article was published almost five years after Plaintiff left her position as Regional President in Los Angeles. From January 2009 until October 2013, Plaintiff was Lead Regional President in Florida.

## XVII.     IN OCTOBER 2013 PLAINTIFF BEGAN HER NEW POSITIONS AT WELLS FARGO BANK N.A.  THESE POSITIONS DID NOT INVOLVE MANAGING RETAIL BRANCHES IN THE COMMUNITY BANK.

88.      In 2013, Pat Callahan, then Chief Administrative Officer at Wells Fargo, asked Plaintiff to Co-lead a Culture of Caring initiative along with Hope Hardison, then head of Human Resources. Plaintiff was told that she was selected because of her reputation for caring about Customers' experience and for her adherence to Wells Fargo's Vision and Values.   At or about the same time, Plaintiff accepted a staff position within Wells Fargo's Community Banking as Affluent Segment and Customer Experience Executive. Neither position involved managing retail branches in the Community Bank.

89.     In her new role regarding the Culture of Caring initiative, Plaintiff and Hope Hardison worked across the enterprise- all lines of business and all staff groups- and traveled

throughout the country to bring clarity and definition to what it meant to care about the customer. Their message was simple, i.e., Wells Fargo's success depended on how much Wells Fargo employees cared for their customers, that all team members worked for the customer, that Wells Fargo team members honored their promises to customers and did their best to create lasting positive experiences for their customers.

**XVIII.** **ON OCTOBER 31, 2013, AN ANONYMOUS LETTER WAS SENT TO THE WELLS FARGO'S BOARD OF DIRECTORS AND SENIOR MEMBERS OF MANAGEMENT IN THE COMMUNITY BANK**

90.    On October 31, 2013, an anonymous email, purportedly on behalf of Wells Fargo team members in the LA/OC Region, was sent to the members of the Board of Directors at Wells Fargo & Company and senior members of management throughout Wells Fargo Bank N.A.  The email set forth specific information which should have been thoroughly investigated.  The email states:

"Subject: URGENT WELLS FARGO BOARD ATTENTION REQUIRED

Dear Board of Directors of Wells Fargo Bank,

We are Wells Fargo Team Members working in your LA/OC Region. We strongly urge you to read this letter in its entirety in hopes that it'll enlighten your perspective on what's really going on in LA/OC.  Our continuous efforts with our leadership team to address these issues have not produced any results. On the contrary! **Since our last communication,** we've witnessed and documented acts of increased pressure from our Regional Presidents ("RP"), Market Presidents ("MP") and District Managers ("DM") against team members; a widespread rotten use of power to further torment branch level employees by placing them on individual "corrective action"/ "performance improvement" notices for THEE most minute nuisances - undermining what Lisa Stevens had preached in her **previous communication** about this phenomenon. **We attempted to reach out to our Senior Leadership team in the LA/OC Region by communicating to them these facts.** Yes, we've saved the proof." (Emphasis added).

91.    The letter refers to "previous correspondence," as follows: "Please refer to Mr. John Sotoodeh and Mrs. Lisa Stevens about the **previous correspondence** we sent out months ago. Nothing happened." (Emphasis added).

92.    The email accused Marla and Reza Razzaghipour, who reported to Sotoodeh, of engaging in inappropriate and unlawful conduct.  It pointed out that branch managers and

district managers had witnessed Marla and Reza's improper conduct. The letter states:

> "Various branch managers and district managers could attest to the fact that Marla and Reza pressured them to having their employees forcefully open incompatible accounts for customers; duplicates and even triplicates."

93.    Reference is made to a videotape involving District Manager Joe Ravens, to wit:

> "Take Joe Ravens for example. This district manager has been videotaped screaming at an entire branch saying that "If I don't become a Market President because of your lack of performance, then you're not fit for this job and I'll bring in others who will!"

94.    The email provides suggestions (a roadmap) for Wells Fargo to identify complicit District Managers:

> "Do your research; identify those districts with the most write-ups or corrective action notices.  The Human Resources department can give you these figures. Unfortunately, even after these recent media developments, the District Managers continue to place team members on Corrective Actions "write-ups" for the most inane reasons.  It should be noted that Lisa Stevens sent **an email out to all store management leaders** requesting for them to refrain from issuing unnecessary Corrective Action write-ups. These leaders should be held accountable for their team members' actions." (Emphasis added).

> "Wells Fargo must act now by investigating these Market Presidents and District Managers to evaluate their involvement. Conduct anonymous client and team member surveys, listen to your low-level employees, you'll be surprised at what they can tell you."

95.    The letter concludes by suggesting that Wells Fargo was once a great company, but that was no longer true due to corruption by its Senior leaders:

> "We are the voice of many (1000+) LA/OC team members. This is a great company which unfortunately has been corrupted by our Senior Leaders that reside directly under you (some mentioned above). We want to continue to make Wells Fargo the greatest company as it once was, with reasonable, logical and concise goals. We'd like to focus on our clients' needs and not on the needs of our Senior Community Banking Leaders.

96.     The email was sent to the Board of Directors and Senior leaders throughout Wells Fargo, as follows:

Stumpf, John; James.m.strother@wellsfargo.com; Levy, Richard D.; David.a.hoyt@wellsfargo.com; Patricia.r.callahan@wellsfargo.com; Carrie.l.tolstedt@wellsfargo.com; Hicks-Veal, Leslie; clegg@wellsfargo.com; Bacon, Michael J. (Corporate Security); Hardison, Hope A.; Callahan, Patricia; Hobson, Ron L; Clemow, Marla; Rose, Diana M.; Rabin, Diana; Choo, Susan S.; Portillo, Jorge A.; Contreraz, Steven R.; zorik.e.yegianian@wellsfargo.com; Moeller, Bryan; Abboud, Ibrahim; Acosta, Dominica.M.; marissa.m.adome@wellsfargo.com; Bishara, Ramez; Ataiyan, Lisa A.; Babakhan, Arthur; Barajas, Rafael; Chow, Joseph J.; Clune, Perry R.; Simms, Jocelyn; Maria.j.burgose@wellsfargo.com; Bonilla, Silvia L.; Russell, Linda D.; Razzaghipour, Reza; Marselis, Jonathan M.; Fracchia, Don A.; stevensl@wellsfargo.com; Carlisle, Chip W.; Paterson, Debra J.; Russ Anderson, Claudia; Starcher, Diana; Zimmerman, Ken A.; Padilla, Saul; Benson, Shelley L.; Martoia, Susan; Haghverdi, Armen; Dicristofaro, David; Avetyan, Argishti; Martinez, Evelin A.; Herrera, Ana D; Quinones, Andy A; Glasser-Weinstein, Adam N.; Yagubyan, Albert; Jaghab, John; Hannig, David; Ohanian, Nazaret; Rafie, Azita; Petroff, Paul P.; Fasheh, Melissa M.; Hossein, Farzaneh; Alvarado, Ben F.; Chang, Danny; Cassidy.q.ngyen@wellsfargo.com; Kobata, Keith H.; Murray, Benjamin J.; Patatanyan, Edgar; Walia, Sandy; Mendoza, Leticia; Tapia flores, Anatyelli N.; Perez, Evelyn R.; Moser, Brad S.; sloat@wellsfargo.com; Stallings, Drew S; Mansi, Lefky T.; Shelley.ffreeman@wellsfargo.com; Stacy.smithers@wellsfargo.com; Tautkus, Cathy; Grismer, Nicola; Montgomery, Darryl A.

97.     Plaintiff was an intended recipient. However, her email address inaccurately set forth.  Plaintiff did not receive a copy of this email.

98.     Plaintiff is informed and believes and therefore alleges that the allegations set forth in this email were ignored and no investigation was conducted.

**XIX.     ON NOVEMBER 14, 2013, AN ANONYMOUS LETTER WAS SENT BY ORANGE COUNTY TEAM MEMBERS TO THE BOARD OF DIRECTORS OF WELLS FARGO AND COMPANY AND SENIOR MANAGEMENT IN THE COMMUNITY BANK.**

99.     On November 14, 2013, an anonymous letter was sent to members of the Board of Wells Fargo & Company and members of senior management throughout the Community Bank on behalf of Orange County team members.

The letter was sent to the following individuals:

Stumpf, John Liohn.g.stumpf@wellsfargo.com]; Callahan, Patricia [callahan@wellsfargo.com]; Tolstedt, Carrie L. [tolstecl@wellsfargo.com]; Sloan, Tim [sloant@wellsfargo.com]; Paterson, Debra J. [dpaterso@wellsfargo.com]; Chambers, Glen G [glen.chambers@wellsfargo.com]; Cook, Deborah [deborah.cook@wellsfargo.com]; Stevens, Lisa (RP West Coast) [stevensl@wellsfargo.com); Nelson, Susan L. (HR Manager) [susan.l.nelson@wellsfargo.com]; rob.w.myers@wellsfargo.com;Sotoodeh, John [sotoodeh@wellsfargo.com]; Fitzsimmons, Tim [tim.fitzsimmons@wellsfargo.com]; Alvarado, Ben F.[alvarb@wellsfargo.com); Kobata, Keith H. [keith.h.kobata@wellsfargo.com]; Allred, My-ngoc [my-ngoc.allred@wellsfargo.com]; Nguyen, Cassidy Q.

[cassidy.q.nguyen@wellsfargo.com]; Tabrizi, Nicha
J.[nicha.j.tabrizi@wellsfargo.com]; Elmezian, Heba
[heba.elmezian@wellsfargo.com]; Mai, Jimmy Uimmy.mai@wellsfargo.com];
Chang, Danny [danny.chang@wellsfargo.com]; Ebrahimi, Shabnam B.
[shabnam.b.ebrahimi@wellsfargo.com]; Dinh, Deena T.
[deena.t.dinh@wellsfargo.com]; Murray, Benjamin J.
[benjamin.j.murray@wellsfargo.com])

The letter accuses John Sotoodeh of creating a hostile environment. It states:

We, your OC Team Members have been reluctant to come forward sooner
because of fear of retaliation and quite frankly because of the perceived "power
and connections" the LA/OC leadership have. But, because of the recent issues
(newspaper articles, facebook page, etc.) arising in LA we feel it is important you
know that the problems are not isolated to the LA area.

2 years ago John Sotoodeh and his leadership took over OC in what can only be
described as what felt like and still feels like a HOSTILE TAKEOVER. The
previous leadership that always put TM's and Customers first were replaced by
militant and arrogant leaders like Ben Alvarado and others who care about results
(no matter how you get there) and their own personal promotions FIRST before
TM's and Customers. Not understanding our Vision and Values and that it is
through engaging TM's and Customers we reach success.

The letter goes on to discuss the extreme sales pressure being exerted.

Can you imagine being scared you are going to lose your job everyday or
constantly being brought to tears because it is never good enough? We can. Many
of our friends have already left or been forced out of the company or Orange
County because of it.

Make your goals at any cost to the team member or customer - this is our
environment. We used to have a coaching and learning environment now we have
a "what do you have today", "complete this checklist", "get on conference calls
early in the morning and at night", basically it's a "be a robot" type of
environment. Forget work life balance. Forget doing what's right for the TM and
Customer. The best performers even feel like it's never good enough.

The letter ends by stating that what they want are good leaders who care.

We LOVE Wells Fargo and our Vision and Values. We LOVE serving customers.
We have worked for leaders in the past who have lived the
Vision. We know what it's supposed to be like, how can it feel like we are
working for an entirely different company now? We are afraid to speak up
because of retaliation. What we can say is that the proof lies in the numbers. Look
at the OC turnover for the past couple of years, look at Engagement Scores, look

at how many team members have left OC or have gone to different jobs within the bank (mortgage, business, etc.). If you could ensure confidentiality, you could ask many team members who are still and no longer in OC.

What do we want? We just want good leaders - leaders who CARE.

100.    The sentiments expressed in the letter from the Los Angeles team members under John Sotoodeh   were echoed in the letter from Orange County team members under John Sotoodeh.

101.    Plaintiff had never been responsible for branches in Orange County when she was Regional President in Los Angeles from 2002-2008.

102.    Plaintiff is informed and believes and therefore alleges that the allegations in the email from Orange County team members were ignored and no investigation was conducted.

## XX.    A SECOND ARTICLE APPEARED IN THE LOS ANGELES TIMES ON DECEMBER 21, 2013, REGARDING WELLS FARGO'S "PRESSURE-COOKER SALES CULTURE".

103.    On December 21, 2013, a second article appeared in the Los Angeles. Times entitled "Wells Fargo's pressure-cooker sales culture comes at a cost."  This article stated, in part, that "the relentless pressure to sell has ... led to ethical breaches.... To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork".

## XXI.    IN SEPTEMBER 2014, PLAINTIFF WAS PROMOTED TO THE POSITION OF HEAD OF CONSUMER CREDIT SOLUTIONS

104.    These Los Angeles Times Articles and the ethical problems disclosed in these articles, including the extreme sales pressures being placed upon team members in Los Angeles, were matters of extreme concern to Wells Fargo and repeatedly discussed by the Board of Directors of Wells Fargo & Company and senior management of the Community Bank after these articles were published.

105.    Wells Fargo did not consider Plaintiff responsible for the simulated funding problems or for the extreme pressure referred to in the Los Angeles Times articles.

106.    Indeed, in September 2014, Wells Fargo Bank announced that Plaintiff was again being promoted to be the head of Consumer Credit Solutions, (CSS), reporting to Avid Modjtabai, Senior Executive Vice President and head of the Consumer Lending Group.

107.    In announcing her promotion, Ms. Modjtabai was quoted as follows: "The products that Shelley will oversee reflect some of the most significant moments in our customers' lives, moments she takes to heart. Her business acumen, collaborative skills, passion for team members, and community involvement make her an ideal choice to lead CCS."

108.    As one of her first acts in her new role, Plaintiff informed the regions that CCS would no longer set goals for credit cards and other products, allowing the regions to establish their own goals.

**XXII.    IN 2014 WELLS FARGO BANK PROMOTED JOHN SOTOODEH**

109.    Notwithstanding the extent of simulated funding occurring in the LA/OC Region in 2013 and notwithstanding the complaints that Wells Fargo had received from Los Angeles and Orange County team members in 2013, Wells Fargo promoted John Sotoodeh in 2014 to a higher-level position as Regional Bank Executive in Texas reporting directly to Tolstedt.  His promotion occurred over the objection of the Community Bank's Chief Risk Officer.

**XXIII.    ON MAY 4th, 2015, THE CITY OF LOS ANGELES FILED A LAWSUIT AGAINST WELLS FARGO BANK N.A.**

110.    On May 4th, 2015, the City of Los Angeles sued Wells Fargo Bank for alleged unfair and deceptive sales practices at its Los Angeles' branches during the period 2011-2015. This period began more than two years after Plaintiff left Los Angeles to become Lead Regional President in Florida.  During the last two years of this period, Plaintiff was no longer managing any branches in the Community Bank.

111.    The lawsuit alleged as follows:

"For years, Wells Fargo & Company and Wells Fargo Bank, National Association (collectively "Wells Fargo") have victimized their customers by using pernicious and often illegal sales tactics to maintain high levels of sales of their banking and financial products. The banking business model employed by Wells Fargo is based on selling customers multiple banking products, which Wells Fargo calls "solutions." In order to achieve its goal of selling a high number of "solutions" to each customer, Wells Fargo imposes unrealistic sales quotas on its employees, and has adopted policies that have,

predictably and naturally, driven its bankers to engage in fraudulent behavior to meet those unreachable goals. As a result, Wells Fargo's employees have engaged in unfair, unlawful, and fraudulent conduct, including opening customer accounts, and issuing credit cards, without authorization. Wells Fargo has known about and encouraged these practices for years. It has done little, if anything, to discourage its Employees' behavior and protect its customers: Worse, on the rare occasions when Wells Fargo did take action against its employees for unethical sales conduct, Wells Fargo further victimized its customers by for failing to inform them of the breaches, refund fees they were owed, or otherwise remedy the injuries that Wells Fargo and its bankers have caused. The result is that Wells Fargo has engineered a virtual fee-generating machine, through which its customers are harmed, its employees take the blame, and Wells Fargo reaps the profits."

112.    The City of Los Angeles' lawsuit spurred investigations by the Consumer Financial Protection Bureau (CFPB), and the Office of the Comptroller of the Currency (OCC).

## XXIV.    THE OCC FINDINGS

113.    As a result of its investigation the OCC made the following findings:

1.    The incentive compensation program and plans within the Wells Fargo Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales pressured Bank employees to sell bank products not authorized by the customer.

2.    Wells Fargo lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight to prevent and detect the unsafe or unsound sales practices.

3.    Wells Fargo lacked a comprehensive customer complaint monitoring process that impeded the bank's ability to:  a) assess customer complaint activity across the Bank; b) adequately monitor, manage, and report on customer complaints; and c) analyze and understand the potential risk of sales practices.

4.    Wells Fargo Community Bank Group failed to adequately oversee sales practices and failed to adequately test and monitor branch employee sales practices.

5.     Wells Fargo audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Bank's sales practices.

THE OCC also determined that the Bank had engaged in certain unsafe or unsound sales practices as follows:

The selling of unwanted deposit or credit card accounts.

The unauthorized opening of deposit or credit card accounts.

The transfer of funds from authorized, existing accounts to unauthorized accounts ("simulated funding").

Unauthorized credit inquiries for purposes of the conduct.

## XXV.     THE CONSUMER FINANCIAL PROTECTION BUREARU (CFPB) ALSO FOUND THAT WELLS FARGO HAD ENGAGED IN IMPROPER SALES PRACTICES

114.     The Consumer Financial Protection Bureau ("CFPB") has supervisory authority over banks, thrifts, and credit unions with assets over $10 billion; its mission is to "regulate the offering and provision of consumer financial products or services under the federal consumer financial laws" and "educate and empower consumers to make better informed financial decisions."

115.     The CFPB alleged that from January 1, 2011, to September 2016, Wells Fargo employees engaged in improper sales practices in connection with an aggressive incentive compensation program that encouraged employees to cross-sell banking products and services to existing customers, submitted credit card applications without customers' authorizations and enrolled customers in online banking services and requested debit cards on their behalf without their knowledge or consent.

116.     The CFPB investigation found Wells Fargo Bank engaged in the following conduct:

Opening deposit accounts and transferring funds without authorization:

COMPLAINT

According to the bank's analysis, employees opened roughly 1.5 million deposit accounts that may not have been authorized by consumers. Employees then transferred funds from consumers' authorized accounts to temporarily fund the new, unauthorized accounts. This widespread practice gave the employees credit for opening the new accounts, allowing them to earn additional compensation and to meet the bank's sales goals. Consumers, in turn, were sometimes harmed because the bank charged them for insufficient funds or overdraft fees because the money was not in their original accounts.

Applying for credit card accounts without authorization:

According to the bank's own analysis, Wells Fargo employees applied for roughly 565,000 credit card accounts that may not have been authorized by consumers. On those unauthorized credit cards, many consumers incurred annual fees, as well as associated finance or interest charges and other fees.

Issuing and activating debit cards without authorization:

Wells Fargo employees requested and issued debit cards without consumers' knowledge or consent, going so far as to create PINs without telling consumers.

Creating phony email addresses to enroll consumers in online-banking services:

Wells Fargo employees created phony email addresses not belonging to consumers to enroll them in online- banking services without their knowledge or consent.

117.    Wells Fargo did not accuse Plaintiff of any wrongdoing in connection with the lawsuit by the City of Los Angeles. Nor did the City of Los Angeles, the OCC or CFPB accuse her of any wrongdoing

## XXVI.   WELLS FARGO RETAINED PWC TO ANALYZE SIMULATED FUNDING THROUGHOUT THE COMMUNITY BANK

118.    In 2015, Wells Fargo retained PricewaterhouseCoopers ("PWC") to identify checking and savings accounts across Wells Fargo's retail bank potentially subject to simulated funding.

119.    PWC conducted a nationwide analysis of Deposit Accounts.  PWC's report dated June 21, 2016, analyzed simulated funding throughout the Community Bank. It was updated on September 14, 2017. Both reports covered a period starting on January 1, 2009. The September 14, 2017 report covered the period from January 1, 2009 through September 30, 2016.

120.     According to PWC's analysis, during the period January 1, 2009 - September 30, 2016, California customers had 26% of the total accounts in the Community Bank. However, California had 48% of the simulated funding accounts, almost twice as much as would have been expected based on California's percentage of total accounts nationwide. Lisa Stevens was Regional President in California in 2009, then head of the West Coast in 2010, reporting directly to Tolstedt.  She was Sotoodeh's supervisor until he left Los Angeles at the end of 2014.  John Sotoodeh was Regional President of LA/OC, the largest region in California from January 1, 2009 until the end of 2014.

121.     Plaintiff did not manage any retail branches in California from January 1, 2009, until September 30, 2016.

122.     From January 1, 2009, to September 30, 2016, Florida had 7% of total accounts throughout the Community Bank, but less than half the percentage of simulated funding accounts expected based on Florida's percentage of total accounts nationwide. Florida had only 3% of the simulated funding accounts during the period from January 1, 2009 until September 30, 2016.

## XXVII.  WELLS FARGO PUBLISHED ITS COMMITMENT TO CUSTOMERS

123.     On December 10, 2015, in an effort to defuse public criticism and the fallout from the lawsuit by the City of Los Angeles City and the governmental investigations, Wells Fargo issued a statement as follows:

> "In order to demonstrate our commitment to customers, as well as to address regulatory expectations, an enterprise Policy and supporting program have been established to ensure that issues that negatively affect our consumers are appropriately addressed, consistent with our overall Vision and Values."

124.     Plaintiff was appointed Chair of the Steering Committee responsible to carry out that commitment and served as such until her termination.

## XXVIII. SEPTEMBER 8, 2016: WELLS FARGO AGREES TO PAY $185 MILLION DOLLARS IN SETTLEMENTS WITH OCC, CFPB, AND LA CITY

125.     The CFPB, OCC and L.A. City Attorney publicly announced their respective settlements with Wells Fargo Bank on September 8, 2016.

126.     Wells Fargo agreed to pay the City of Los Angeles $50 million.

127.      Wells Fargo agreed to pay the CFPB a civil penalty of $100 million dollars.

28

128.    Wells Fargo agreed to pay the OCC a civil penalty of $35 million dollars.

129.    Each settlement required Wells Fargo to engage in remedial actions designed to compensate customers harmed by its actions and to ensure that Wells Fargo would no longer engage in unsafe, improper and reckless sales practices which included opening and manipulating customer accounts without the customers' authorization.

**XXIX.    PLAINTIFF WAS SELECTED TO JOIN THE EXECUTIVE GROUP WORKING ON REMEDIATION EFFORTS**

130.    After announcement of the consent orders, Plaintiff was enlisted to join the executive working group which was tasked with setting up the consent order implementation process.

131.    She was actively working in that role on various projects until her termination in February 2017.

**XXX. SHAREHOLDER LAWSUIT AGAINST WELLS FARGO'S BOARD OF DIRECTORS AND EXECUTIVES**

132.    On September 29, 2016, shareholders of Wells Fargo filed a lawsuit against the Wells Fargo & Co. Board of Directors (and certain executives) in the U.S. District Court for the Northern District of California, alleging, among other things, that employees in the Community Bank opened accounts without customer knowledge or authorization, and that the defendants breached their fiduciary duties to Wells Fargo and other alleged improprieties. See *In re Wells Fargo & Company Shareholder Derivative Litigation*, 4:16- cv-05541, Dkt. No. 1 (N.D. Cal Sept. 29, 2016). The defendants in that lawsuit included Mr. Stumpf, Ms. Tolstedt, and numerous Wells Fargo Board Members.

133.    On September 27, 2016, the Wells Fargo Board of Directors formed a four-director Oversight Committee to investigate, inter alia, whether and when the Board of Directors at Wells Fargo & Co. and Wells Fargo's senior management knew about the sales misconduct issues.

134.    The Directors retained Shearman & Sterling to conduct the internal investigation, the same law firm concurrently representing them in the lawsuit brought by investors accusing

them of having knowledge of sales practices misconduct and failing to take appropriate action, a clear conflict of interest.

## XXXI.   PLAINTIFF'S ROLE IN REMEDIATION EFFORTS FOLLOWING THE SETTLEMENTS

135.    In the days leading up to the settlements and Consent Orders, Plaintiff was considered one of the most trusted members of management at Wells Fargo.  She was considered to be beyond reproach in regard to the scandals that were being addressed.

136.    Plaintiff played a leadership role in addressing the Consent Orders.  She was part of the Executive Working Group and attended senior leadership meetings along with the most senior members of management to address and engage in the mediation efforts required by the Consent Orders.

137.    Until she was abruptly terminated in February 2017, Plaintiff was a key player regarding Wells Fargo's efforts to address its sales practice issues and meet the requirements of the settlement with the City of Los Angeles and the Consent Orders.

## XXXII.   WELLS FARGO DEFAMED PLAINTIFF ON FEBRUARY 21, 2017

138.    On February 21, 2017, Plaintiff was advised that she was being terminated "for cause".  When she inquired as to the "cause "for her termination, the person delivering this news did not know.

139.    Later that day, Wells Fargo & Co. publicly announced that Plaintiff had been fired "for cause" in the following public statement:

"San Francisco - (BUSINESS WIRE) - Wells Fargo & Company (NYSE-WFC) today announced employment terminations based on its Board of Directors ongoing independent investigation into the Company's retail banking sales practices and related matters.  Four current or former senior managers in Community Banking have been terminated by the Company for cause by a unanimous vote of the Board."

140.    Plaintiff was identified as one of the senior managers terminated for cause by the Board of Directors.

141.    There was no cause for Plaintiff's termination. The statement that Plaintiff was fired" "for cause" was false and defamatory.

142.    On the same day, February 21, 2017, in a telephone call with senior leaders of Wells Fargo & Co and Wells Fargo Bank, Tim Sloan, Wells Fargo & Co's CEO, maliciously and falsely stated that Plaintiff was one of the individuals responsible for improper sales practices which occurred in Los Angeles. The sales practices referred to occurred years after Plaintiff had left Los Angeles.  Tim Sloan's statements were false and defamatory.

143.    Plaintiff's termination came as a complete shock and surprise to her.  Plaintiff felt very secure in her position at Wells Fargo.  Up until the date of her termination, she played an important leadership role as a member of the Consent Order Executive Working Group, and as an attendee at senior leadership meetings tasked with remediating the problems that had been identified as a result of the governmental investigations.

144.    As of the date of her termination, Plaintiff had vested stock options worth approximately four million dollars which she could have exercised at any time.  These options were forfeited upon Plaintiff's termination "for cause".  If Plaintiff had any inkling of Wells Fargo's intention to terminate her, she could and would have exercised those options.

145.    Although Plaintiff was eligible to retire, Wells Fargo did not allow her the same opportunity extended to other executives. If Plaintiff had any inkling of Wells Fargo's intention to terminate her, she would have retired in which case Plaintiff's unvested restricted stock would have continued to vest. Plaintiff's loss of unvested stock was worth approximately three million dollars.

## XXXIII.   PLAINTIFF WAS DEFAMED WORLDWIDE BY WELLS FARGO & CO'S BOARD OF DIRECTORS REPORT

146.    On April 10, 2017, Wells Fargo's Board of Directors released the results of its investigation a report which was disseminated worldwide (Board Report).

147.    The Board Report was replete with defamatory statements concerning Plaintiff including the following:

> Over time, even as senior regional leaders challenged and criticized the increasingly unrealistic sales goals - arguing that they generated sales of products that customers neither needed nor used - the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization.

This was especially true in areas where bad practices tended to disproportionately cluster, like Los Angeles and Arizona. Senior bankers there were particularly associated with extreme pressure, in some cases calling their subordinates several times a day to check in on sales performance and chastising those who failed to meet sales objectives. Certain managers also explicitly encouraged their subordinates to sell unnecessary products to their customers in an effort to meet the Community Bank's sales goals.

148.    It is clear that foregoing paragraph in the Board Report was understood by those reading it as referring to Plaintiff because of the context and circumstances contained therein, and the following defamatory statements:

Also, growing out of this investigation, on February 21, 2017, the Board announced the termination for cause of four officers within the Community Bank: its Group Risk Officer, its Head of Strategic Planning and Finance, who was primarily responsible for overseeing the sales goals and incentive system, and two senior regional banking leaders who had headed Los Angeles and Arizona and who encouraged and deployed especially improper and excessive sales practices. In doing so, the Board accorded credit to and treated differently other senior Community Bank leaders who made reasonable, good faith efforts to challenge and escalate concerns over sales goals and conduct.

California and Arizona in particular consistently ranked among the top states for sales practice problems, in part based on sales pressure tactics encouraged by certain regional managers.

Los Angeles experienced a disproportionately high rate of sales integrity issues over time, and certain leaders in Los Angeles were associated with creating a high-pressure environment. Witnesses consistently described Shelley Freeman - who was Regional President in Los Angeles until 2009, then became the Lead Regional President in Florida until 2013 - as an aggressive sales manager who created significant sales pressure. For instance, Freeman authored her own "motivator" emails, which featured her team's ranking on the Community Bank's "Motivator" and strongly emphasized the importance of increasing sales and being number one.

Witnesses also stated that Freeman suggested to subordinates that they encourage customers to sign up for products regardless of need.

After the merger with Wachovia, Wells Fargo sent Freeman to Florida. She continued to impose significant sales pressure; according to one witness, she strongly emphasized the importance of hitting sales goals and tolerated increased low quality accounts - as did members of Community Bank senior leadership - as a consequence of striving for increased sales. As an example, by September 2012 the Rolling Funding Rate for Florida had dropped to approximately 71%, lower than the Rolling Fund Rate for the entire Community Bank, which had itself declined to approximately 77%.

149.    The foregoing statements were false and defamatory.

150.     Wells Fargo & Company was malicious in publicly stating that Plaintiff had been terminated "for cause" and for disseminating the Board Report defaming Plaintiff worldwide.

151.     The investigation was rife with conflicts of interest as the law firm which had been hired to conduct the investigation was simultaneously defending the Board of Directors in multiple derivative lawsuits.

152.     The Board's objectives were to mitigate their own responsibility for the scandal by blaming others, including Plaintiff, and to protect their newly appointed CEO, Tim Sloan. Plaintiff was told "our highest priority is to protect Tim on what he knew and when he knew it." This caused Plaintiff significant concerns which she escalated to David Marks and her supervisor, Avid Modjtabai.

153.     Plaintiff was made a scapegoat in Wells Fargo's attempt to protect Sloan and others at Wells Fargo.

154.     In publicly issuing the Board Report defaming Plaintiff worldwide, Wells Fargo ignored countless documents which demonstrated Plaintiff's high ethical standards while she was in Los Angeles and in Florida.  Wells Fargo ignored her demonstrated commitment to Wells Fargo's Vision and Values and putting the interests of the customers first and always doing what was right for the customer.  Wells Fargo ignored her documented opposition to low quality accounts and her zero tolerance for unethical behavior.  Wells Fargo ignored her many escalations to more senior management at Wells Fargo concerning sales goals, sales integrity, sales pressure, and incentive compensation plans.

155.     In each instance, the Board Report did everything possible to place Plaintiff in a false light.  For example, the Board report states, "After the merger with Wachovia, Wells Fargo sent Freeman to Florida" without any mention that her move to Florida was as a result of a promotion to Lead Regional President in Florida.  The Board Report makes no mention of Plaintiff's subsequent promotions.  In discussing Plaintiff's "motivator" emails, it fails to mention the numerous times that Plaintiff used these motivators to encourage team members to act ethically and do what was right for the customers.  There was not a shred of evidence that Plaintiff ever used them to suggest that team members engage in unethical behavior.

156.     Wells Fargo Defendants knew or should have known that the simulated funding problems, occurring and identified in Los Angeles more than four years after Plaintiff had left Los Angeles, were not and could not have been caused by Plaintiff's actions.

157.     While excoriating Plaintiff, the Board report went out of its way to protect John Sotoodeh and Lisa Stevens.  The Board Report stated as follows:

> Freeman's successor in Los Angeles, John Sotoodeh, also displayed a high-pressure management style, particularly in San Diego prior to moving to Los Angeles. And Sotoodeh presided over Los Angeles when it became the epicenter of the simulated funding phenomenon that came to light in 2013.

> However, multiple witnesses described Sotoodeh as having made significant attempts to improve the sales culture in Los Angeles. He instituted an employee recognition system which integrated customer experience scores in addition to sales performance, and developed several new training initiatives to help employees hone their customer service skills and reinforce sales ethics, including a program specifically addressing the Jump into January campaign.

158.     The Board Report defamed Plaintiff while excusing Sotoodeh.  It made no mention of the letters that had been sent by Los Angeles and Orange County team members in 2013. While acknowledging that Los Angeles was the "epicenter" of the simulated funding phenomenon" it failed to explain how the phenomenon arose in Sotoodeh's LA/OC region almost five years after Plaintiff had left Los Angeles to assume her role in Florida.

159.     The Board Report also failed to explain why the west coast, under Lisa Stevens, had such a disproportionate amount of simulated funding as reflected in the PWC report for the period which began after Plaintiff had left Los Angeles.

160.     Wells Fargo knew when it issued its report that on October 4, 2016 there was an analysis of simulated funding accounts amongst 16 Lead Regional Presidents during the period from 2011-2015 and that Sotoodeh's region was #1 with the most simulated funding accounts. Pam Conboy in Arizona was #2.  Michelle Lee was #3.  Plaintiff is not mentioned.

161.     The report compared simulated funding for a 20 month period when Reza Razzaghipour reported to Sotoodeh to a similar period in 2014-2015 when Razzaghipour reported to David Galasso. The report concluded that for the 20 month period starting in 2012 Reza Razzaghipour, while reporting to Sotoodeh, 989 team members opened 63,440 simulated

funding accounts, an average of 64 accounts per team member.  205 of these team members opened 100 or more simulated funding accounts.   For the subsequent 20 month period under Galasso, 692 team members under Reza Razzaghipour opened 10,361 accounts, an average of 15 per team member, with three team members having 100 or more accounts.

162.    Wells Fargo Defendants knew or should have known that John Sotoodeh, was the recipient of a significant investigations memo in October of 2013 where more than 100 employees were identified as engaging in unethical practices.

163.    The investigation by PWC reflected that nearly half of the accounts nationwide with simulated funding problems were in California during the period from 2009-2016.

164.    Wells Fargo knew or should have known that the information that they were given to the effect that Plaintiff tolerated low funded accounts was contrary to numerous communications from Plaintiff to her team indicating that Plaintiff had no tolerance for low funded accounts.

165.    Wells Fargo was aware that in their investigation in 2013 that employees interviewed stated that they were instructed to engage in improper behavior.  Wells Fargo knew that these statements were not investigated and made no attempt to do so before issuing the Board Report.

166.    Wells Fargo knew or should have known that Plaintiff did not tolerate or condone unethical behavior and that during her entire employment at Wells Fargo she always advocated that Wells Fargo employees sell products in accordance with customer needs and adhere to Wells Fargo's Vision and Values.

167.    Wells Fargo's investigation and release of the Board Report, and the false statements about the Plaintiff contained therein, was further malicious and reckless as follows:

   a.   Plaintiff was never confronted with the allegations against her or provided with an opportunity to respond.
   b.   The investigators failed to review and properly consider Plaintiff's employment history at Wells Fargo.

c.  Numerous individuals who reported to Plaintiff in Los Angeles and Florida were not interviewed.  These included Plaintiff's direct reports who provided sales and marketing support in both Los Angeles and Florida and Plaintiff's Los Angeles head of learning   and development who later became head of learning and development for the Community Bank. It also included many of her direct reports who were responsible for leading the markets reporting to her. These individuals would have substantiated Plaintiff's ethics and integrity and refuted any notion that she ever instructed Wells Fargo employees to sell products regardless of customer needs. Plaintiff did not know that she was being targeted and was never asked who she felt that Wells Fargo should interview in response to any allegations made against her.

d.  The Wells Fargo investigation failed to review and consider the vast amount of documentary evidence which demonstrated that Plaintiff repeatedly escalated concerns about goals and incentives being too high and out of alignment with the financial and sales plans.

e.  The Wells Fargo investigation failed to review and consider the vast amount of documentary evidence that demonstrated that Plaintiff had zero tolerance for low quality and unfunded accounts.

f.  The Wells Fargo investigation failed to review and consider the vast amount of documentary evidence demonstrating Plaintiff's commitment to sales quality and sales integrity.

g.  The Wells Fargo investigation failed to review and consider the vast amount of documentary evidence that proved that Plaintiff regularly communicated to her team to do what was right for customers; to conduct a needs assessment so as to match the right products to their needs and explicitly told her leadership team not to sell products to customers that did not meet their needs.

h.  The Wells Fargo investigation failed to review and consider the vast amount of documentary evidence which reflected Plaintiff's focus on putting the customer first and adhering to Wells Fargo's Vision and Values.

i. The Wells Fargo investigation failed to review and/or consider that the study by PWC indicated that California, during the years after Plaintiff left Los Angeles, was substantially over indexed in potentially unauthorized accounts while Florida was substantially underindexed.

j. The Wells Fargo investigation failed to review and consider that PWC found that California had 32% of potentially unauthorized credit card accounts but only 23% of all credit cards. This was for 2009-2016, the years after Plaintiff left Los Angeles. Florida, on the other hand, during this same period had 12% of all credit card accounts, but only 10% of potentially unauthorized credit cards.

k. The Wells Fargo investigation failed to review and consider Plaintiff's performance reviews from 2002 to 2008 when Plaintiff ran the Los Angeles region, which indicated, that Plaintiff consistently ran a safe banking operation. Similarly, they failed to review Plaintiff's performance reviews for subsequent years which reflected her commitment to customers, excellence in leadership and management and advocacy of Wells Fargo's Vision and Values.

l. The Wells Fargo investigation failed to review and consider Plaintiff's risk rating as a member of the Management Committee Review Group.  Plaintiff was told by Consumer Lending's Group Risk Officer that he believed she was the best risk manager in Wells Fargo.

m. The Wells Fargo investigation failed to review and consider the documentary evidence that in a nationwide survey in 2013 conducted by the CB Group Risk Officer that only two bankers in Florida were identified as conducting improper sales activities: neither one for simulated funding.

n. The Wells Fargo investigation failed to review and consider that the simulated funding scandal surfaced 57 months after Plaintiff had left the Los Angeles market. That was when the first Los Angeles Times article appeared. There was no evidence that the simulated funding problems which surfaced years after Plaintiff left Los Angeles was caused by Plaintiff.

o.  John Sotoodeh, who was in charge of Los Angeles and Orange County in 2013 was the recipient of a significant investigations memo ("SIN") in October 2013, informing him that his region was the subject of a large-scale investigation and that more than 100 employees had been identified as engaging in unethical practices.   He and his supervisor, Lisa Stevens, presided over regions that PWC found had a highly disproportionate number of simulated funding accounts while, in sharp contrast, Florida's simulated funding accounts were under indexed.

p.  Wells Fargo was willing to accept self-serving statements by Sotoodeh and Stevens blaming the problems in their regions on Plaintiff even though there was no evidence that these problems existed in Los Angeles from 2002-2008 when Plaintiff was in charge of the Los Angeles region.  Moreover, Plaintiff never was in charge of Orange County, where the same problems that existed in Los Angeles surfaced as well. There was no study or report that backed up the assertion that the problems in Los Angeles in 2013 and thereafter were as a result of Plaintiff's actions.

q.  Wells Fargo knew that although Los Angeles was the epicenter of the simulated funding scandal in 2013 while Sotoodeh was in charge of LA/OC, that Wells Fargo promoted Sotoodeh in 2014.

r.  Wells Fargo in the Board Report identified a number of points in time when the ratio of unfunded accounts was higher in Plaintiff's market than in Sotoodeh's while ignoring the myriad of times that the opposite was true.

s.  Wells Fargo ignored dozens of internal reports which were readily available highlighting the sales quality problems of the Los Angeles market under Sotoodeh and more broadly, in Lisa Stevens' West Coast markets.

t.  The Board Report refers to Plaintiff sending out "Motivators" throughout her tenure in Los Angeles and in Florida. There is nothing in these motivators which suggest that anyone should engage in improper behavior.  To the contrary, the motivators emphasized always doing the right thing for customers.  For example, on January 3, 2007 Plaintiff sent a "Motivator" to hundreds of employees in her Los Angeles region

which stated: " Now our job is to make sure that every single account funds and that we also follow up with every new customer to make sure they got their checks, that everything is okay and to schedule them for a second appointment for further profile and explore opportunities to help them succeed financially."

u. The Board report erroneously states that by September 2012 the Rolling Funding Rate for Florida was 71`% which was lower than the entire Community Bank. The Board report got the facts wrong. Florida was at a 74% funding rate in September 2012, while an acceptable rate was 72%.

v. The Wells Fargo investigation failed to consider that Marla Razzaghipour, who Plaintiff on information and belief, alleges was the source of the statement that Plaintiff engaged in unethical conduct as stated in the Board Report, was fired in March 2017 as a result of engaging in improper conduct. Moreover, Plaintiff is informed and believes that Razzaghipour alleged that she reported unethical and illegal sales practices by John Sotoodeh to senior management prior to the issuance of the Board Report. Wells Fargo maliciously accepted what Marla Razzaghipour said about Plaintiff, and published her defamatory accusations as though they were facts, and at the same time ignored accusations against Sotoodeh.

w. When Sotoodeh was promoted to take over the Los Angeles market, Kim Young took over the Southern California market that Sotoodeh had previously been in charge of. She found that he had left considerable questionable sales practices in his wake. Plaintiff alleges on information and belief that Wells Fargo was aware of Kim Young's information prior to the release of the Board report, or should have been aware of it.

x. The Board Report references Plaintiff's role in the Jump into January campaign, but fails to mention that after Plaintiff moved to Florida, Sotoodeh and Stevens continued to lead the country in the Jump into January annual campaigns. The investigation likewise ignores and fails to consider Plaintiff's objection to the continuation of the

Campaign, or that the Campaign was designed and mandated by Community Bank senior leadership.

 y. The Board Report deliberately goes out of its way to cherry pick points in time to smear the Plaintiff:

  i. It references points in time when the Plaintiff's Rolling Funding Rate was less than Sotoodeh's or lower than the regional bank average but fails to consider points in time when the opposite was true, or as documented in Plaintiff's performance reviews, above the bank's tolerance thresholds.

  ii. It deliberately and maliciously ignores points in time when Sotoodeh and Stevens' markets had significantly worse metrics than the Plaintiff.  In June 2012 the Plaintiff's Florida market had a score at 3.27 on the company's Sales Quality Scorecard, well above the minimum score of 3, while Sotoodeh's market was 2.97 and Stevens' entire West Coast market is at just 3.01. At year end 2012, Florida was at 3.1 among the highest in the company, versus the regional bank average was at 2.86.

 168. The Board Report went out of its way to absolve Mike Loughlin, Wells Fargo Bank's Chief Risk Officer, of responsibility for the scandal. The Board report stated, "The CRO did not have any line authority or directive power to enforce changes on the lines of business. He could, and did, try to exercise his influence to encourage the businesses to address risk issues and to air them more broadly within the bank.

 169. On January 17, 2018, Mike Loughlin, was allowed to retire. In announcing his retirement Timothy Sloan, Wells Fargo's president and CEO stated, "Mike has demonstrated leadership and a commitment to all our stakeholders, especially our customers, in one of our company's most critical roles, and for that we are grateful."

 170. Subsequently the OCC charged Mr. Loughlin with violating his ethical and legal duties and thereafter entered a Consent Order with Mr. Loughlin wherein he agreed to pay a fine of $1,250,000. In the Consent Order the OCC found that Mr. Loughlin "acted recklessly engaged in unsafe or unsound practices and breached his fiduciary duty to the bank".

171.   Similarly, James Strother, Wells Fargo's General Counsel, was allowed to retire on March 27, 2017, shortly before the Board report was made public.  The Board report discussed (at pages 72-79) the failures of the Law Department recognizing the significance of sales integrity terminations or to appreciate that sales integrity issues reflected a systemic breakdown in Wells Fargo's culture and values. It also faulted the law department for its ongoing failures to correct the widespread breaches of trust in the misuse of customers' personal data and financial information. Mr. Strothers was not singled out or faulted in connection with these findings even though he oversaw the Law department during the relevant periods.

172.   Subsequently, the OCC charged Mr. Strother for his role in the Bank's systemic sales practices misconduct. He also agreed to pay a fine of 3.5 million dollars as part of a Consent Order with the OCC.

173.   John Sotoodeh and Lisa Stevens were demoted in March, 2017, the month before the Board report was released. Mr. Sotoodeh was fired without cause before the end of 2017.

## **FIRST CAUSE OF ACTION**

## **(For Defamation Against all Defendants)**

174.   By this reference, Plaintiff incorporates the allegations set forth in Paragraphs 1 through 173, inclusive, hereof as though fully set forth at this point.

175.   The above-alleged publications were unprivileged. Prior to the defamatory statements by the defendants as alleged herein, the defendant was a private person, not a public figure. At no time did she voluntarily inject itself into the controversy that gave rise to the defendants' defamatory statements.

176.   The assertions that the plaintiff was terminated for "cause" were false and defamatory.

177.   The false assertions by the defendants that the plaintiff was terminated for cause and/or was responsible for the failures of Wells Fargo clearly conveyed to and/or were understood by the banking community and public at large as assertions that the plaintiff  had committed, directed others to commit, conspired to commit, encouraged others to commit,

intentionally ignored information regarding or tolerated fraud, unprofessional conduct, unethical conduct and/or financial crimes at Wells Fargo.

178.   The defamatory statements by Wells Fargo implied assertions of objective fact by the defendants and implied that those assertions were susceptible of being proved true or false.

179.   The false statements by Wells Fargo regarding the plaintiff have a natural tendency to directly injure her in her office/occupation as a senior manager in the field of banking, and in any role in the field of banking, by imputing general disqualification in those respects which the office/occupation peculiarly requires, or suggesting that the plaintiff participated in crime. Those statements otherwise expose the plaintiff to hatred, contempt, ridicule, or obloquy.

180.   The above-alleged publications by the defendants concerning the plaintiff having been terminated for cause placed the plaintiff in a false light in before the public.

181.   As a result of Wells Fargo's publication of the above alleged defamatory statements, the plaintiff's reputation and career in banking have been destroyed.  She has suffered and will continue to suffer economic harm.

182.   As a result of Wells Fargo's publication of the above alleged defamatory statements, the plaintiff has suffered and will continue to suffer extreme emotional distress, shame, humiliation, pain and anguish and injury to her reputation.

183.   The amount of the plaintiff's general and special damages exceeds the jurisdictional minimum of the Superior Court and will be proven at trial.

184.   Wells Fargo knew or acted in reckless disregard for the falsity of their false publications about the plaintiff, and for the false light in which the plaintiff would be placed. The conduct of Wells Fargo described above was performed with malice, fraud and oppression, conscious disregard for Plaintiff's rights and feelings and/or with the intent, design and purpose of injuring her.  Wells Fargo, through its Board of Director officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct complained of herein. As a result, plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial.

**SECOND CAUSE OF ACTION**

**(For Violation Of California Labor Code Section 1054 Et Seq (Misrepresentation preventing employment) Against all defendants)**

185.     By this reference, Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1 through 173, inclusive, hereof as though fully set forth at this point. California Labor Code section 1050 makes it illegal for an employer who has discharged an employee from service to make a misrepresentation that prevents or attempts to prevent the former employee from obtaining employment.

186.     After plaintiff's employment with Wells Fargo ended, Wells Fargo made the above alleged false or misleading representations about the plaintiff to the entire banking community worldwide, and to any and all entities who might have employed the plaintiff.

187.     As alleged hereinabove, those representations about the plaintiff were not true.

188.     When they made those representations about the plaintiff, Wells Fargo knew the representations were not true.

189.     The above alleged misrepresentations about the plaintiff prevented the plaintiff from obtaining employment.

190.     The above alleged misrepresentations about the plaintiff caused her economic harm amount that exceeds the jurisdictional limit of this Court, and that will be proven at trial.

191.     As a direct and proximate result of defendants' actions, plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in an amount in excess of the jurisdictional minimum of this court to be proven at trial.

192.     Pursuant to California Labor Code section 1054 Wells Fargo is liable to the party aggrieved, in a civil action, for treble damages. The defendants are liable

**THIRD CAUSE OF ACTION**

**(For Invasion Of Privacy Against All Defendants)**

193.     By this reference, Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1 through 173, inclusive, hereof as though fully set forth at this point.

COMPLAINT

194.   An employee's personnel records and employment information are protected by an individual's constitutional right to privacy. An employee has a reasonable expectation of privacy as to employment records and information.

195.   Wells Fargo made the above alleged public disclosure of alleged information about the reasons for the plaintiff's termination. Such alleged reasons were, true or false, protected by plaintiff's rights of privacy.

196.   The disclosures of private alleged facts regarding the plaintiff's performance and termination would be offensive and objectionable to a reasonable person.

197.   The above alleged disclosures by Wells Fargo were not of legitimate public concern.

198.   As a direct and proximate result of defendants' willful, knowing and intentional disclosure, plaintiff has suffered and will continue to suffer economic loss, pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in an amount in excess of the jurisdictional minimum of the court and which will be proven at trial.

199.   The conduct of Wells Fargo described above was performed with malice, fraud and oppression, conscious disregard for Plaintiff's rights and feelings and/or with the intent, design and purpose of injuring her.  Defendants, through their officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct complained of herein. As a result, plaintiff is entitled to punitive or exemplary damages from defendants in a sum according to proof at trial.

WHEREFORE, Plaintiff prays judgment as follows:

**ON THE FIRST CAUSE OF ACTION:**

1.   That Plaintiff be awarded general and special damages in an amount according to proof at trial;

2.   That Plaintiff be awarded punitive damages in an amount according to proof at trial;

3.   That Plaintiff be awarded costs of suit; and

1    4.    That this Court award such other and further relief as the Court deems just and

2  proper.

3  **ON THE SECOND CAUSE OF ACTION:**

4    1.    That Plaintiff be awarded general and special damages in an amount according to

5  proof at trial;

6    2.    That Plaintiff be awarded treble damages as allowed by statute;

7    3.    That Plaintiff be awarded costs of suit; and

8    4.    That this Court award such other and further relief as the Court deems just and

9  proper.

10  **ON THE THIRD CAUSE OF ACTION:**

11    1.    That Plaintiff be awarded general and special damages in an amount according to

12  proof at trial;

13    2.    That Plaintiff be awarded punitive damages in an amount according to proof at

14  trial;

15    3.    That Plaintiff be awarded costs of suit; and

16    4.    That this Court award such other and further relief as the Court deems just and

17  proper.

18

19  DATED: February 1, 2023                    ALLRED, MAROKO & GOLDBERG

20

21                                          By: _____

22                                          NATHAN GOLDBERG
                                            JOHN S. WEST
23                                          Attorneys for Plaintiff,
                                            SHELLEY FREEMAN
24

25

26

27

28

COMPLAINT