United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLEY FREEMAN,<br><br>                    Plaintiff,<br><br>        v.<br><br>WELLS FARGO & COMPANY, et al.,<br><br>                    Defendants. | Case No.  23-cv-00476-DMR<br><br>**ORDER ON SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS**<br><br>Re: Dkt. No. 20 |

Plaintiff Shelley Freeman filed this action alleging defamation and related claims against her former employer, Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo"). Wells Fargo filed a special motion to strike the complaint pursuant to California's anti-SLAPP statute, California Code of Civil Procedure section 425.16, and to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). [Docket No. 20.] This matter is suitable for determination without a hearing. Civil L.R. 7-1(b). For the following reasons, the motion to dismiss is granted in part and denied in part. The anti-SLAPP motion is denied without prejudice as to Plaintiff's invasion of privacy claim but is otherwise denied.

## I.     BACKGROUND

Freeman makes the following allegations in the complaint, all of which are taken as true for purposes of these motions.[1] Freeman is a Florida resident. She began working for Wells Fargo in 1996 in its brokerage and private banking departments and held various positions until her termination in 2017. Compl. ¶¶ 1, 10, 11, 14, 27, 66-67, 106, 138.

In 2002, Freeman joined Wells Fargo's Community Bank as Regional President in charge

---

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

of the Los Angeles region.  The Community Bank "was responsible for customers' checking and savings accounts, certificates of deposit, debit cards, credit cards, etc." through Wells Fargo's branches.  *Id*. at ¶¶ 3, 28, 28.  The complaint describes the Community Bank as "an aggressive sales organization."  *Id*. at ¶ 30.  Freeman led the Los Angeles region from 2002 through the end of 2008 and describes her tenure there as "a period of rapid expansion," with large increases in the numbers of bankers and branches.  *Id*. at ¶¶ 19, 32, 48.  She alleges that she "devoted herself to elevate the professionalism of team members," installed a 16-week training program, and placed "[l]eading with integrity and improving the customer experience . . . at the forefront of [her communications with her team."  *Id*. at ¶ 34.  She received positive annual performance reviews that included praise for her integrity and commitment to Wells Fargo's "vision and values" and running of "a safe and sound banking operation."  *Id*. at ¶ 39(a), (f), (l), (p).

The complaint identifies "sales practice issues" during Freeman's tenure in the Los Angeles region.  These "primarily centered around debit cards for which the compensation plans rewarded bankers no matter how many were given to a single customer."  *Id*. at ¶ 40.  Freeman "repeatedly complained to Wells Fargo senior management that . . . sales credit should only be given for one card," but this policy, "which incentivized bankers to deliver multiple debit cards, remained in effect . . ."  *Id*.  Freeman also had "'zero tolerance' for unfunded accounts" and "advocated providing sales credit to bankers only when accounts funded, but more senior Wells Fargo Community Bank management disagreed" and the bank "continued to provide sales credits to its bankers for accounts that were opened, even if they were not funded."  *Id*. at ¶ 41.  Nonetheless, Freeman "made it known that she had zero tolerance for bankers in her region who opened checking accounts that were not funded," including emailing her team in August 2007 that "we must have zero tolerance for being in the red on checking."  *Id*. at ¶ 43.

In 2008 Wells Fargo acquired Wachovia.  Freeman left the Los Angeles region in late 2008/early 2009 after being promoted to Wells Fargo's Lead Regional President in Florida.  In that role, she alleges that she "promoted Wells Fargo's 'Vision and Values' amongst the former Wachovia employees," emphasized the importance of "[s]ales integrity training" and "repeatedly emphasized the importance of assessing the customer's needs . . ."  *Id*. at ¶ 38, 51, 52, 54.

United States District Court
Northern District of California

1    Freeman "showed no tolerance for improper sales practices" while she was the Lead Regional

2    President in Florida.  In July 2009, she instructed "her team to investigate these issues" and

3    emailed them that "she had zero tolerance for 'gaming' (manipulating the incentive system for

4    personal gain or cheating to achieve sales goals)."  *Id*. at ¶ 57.

5           Freeman alleges that when she was in Los Angeles, Wells Fargo's sales goals had been

6    "set through a highly collaborative process" which she describes as a "bottoms-up" approach that

7    "created accountability."  *Id*. at ¶ 58.  She alleges that the sales goals changed to a "top-down

8    approach" after she moved to Florida, and that from 2009 through 2011, "the Wells Fargo regions

9    were given unrealistic sales goals."  *Id*. at ¶¶ 59, 60.  Freeman objected to these sales goals and to

10   Wells Fargo's "dismantl[ing] [of] its previous hiring and training practices to get bankers working

11   in stores as quickly as possible."  *Id*. at ¶¶ 61-63.  She alleges that "Florida had the lowest cross-

12   sell of all the Eastern regions" and that "Florida did not sell as many debit cards as other regions

13   due to [her] adamant refusal to allow team members in Florida to sell customers debit cards that

14   they did not need."  *Id*. at ¶ 65.  However, sales practice violations increased throughout the

15   Community Bank "[a]s poorly trained bankers attempted to achieve sales goals that were not

16   achievable."  *Id*. at ¶ 64.  Nonetheless, Freeman "continued to receive outstanding performance

17   reviews" during her tenure in Florida.  *Id*. at ¶ 13.  She ultimately "became demoralized and

18   despondent" "[a]s a result of the changed environment at Wells Fargo's Community Bank" and

19   took a new position in October 2013 that did not involve managing retail branches.  *Id*. at ¶¶ 66-

20   67, 88.

21          In 2013, it came to light that Wells Fargo's Community Bank had been engaging in

22   improper sales practices.  Specifically, "[t]he Bank was caught selling unwanted, unneeded

23   products to its customers and opening millions of unauthorized accounts."  *Id*. at ¶ 8.  Starting in

24   the summer of 2013, Wells Fargo investigated simulated funding, which the complaint defines as

25   "the improper manipulation of funds in and out of accounts" or "funding one account, and then

26   transferring those same funds between other accounts for the sole purpose of meeting funding

27   requirements."  *Id*. at ¶¶ 73, 76, 77.  Wells Fargo determined that the highest concentration of

28   simulated funding was taking place in the Los Angeles region, which now included Orange

United States District Court
Northern District of California

1    County, and terminated numerous employees following the investigation.  *Id*. at ¶¶ 77-85.

2         In October 2013, the *Los Angeles Times* published its first article about the scandal,

3    entitled "Wells Fargo fires workers accused of cheating on sales goals."  The article referred to

4    "employees being placed under intense pressure to meet sales goals."  *Id*. at ¶ 86.  Around the

5    same time, employees in the Los Angeles/Orange County region sent two anonymous

6    communications to Wells Fargo's Board of Directors and members of senior management

7    accusing specific leaders of "inappropriate and unlawful conduct" and "extreme sales pressure

8    being exerted" on employees.  *Id*. at ¶¶ 96, 99-100.  In particular, the anonymous employees

9    accused Freeman's successor, John Sotoodeh, "of creating a hostile environment."  *Id*. at ¶¶ 50,

10   99.  The *Los Angeles Times* published a second article in December 2013, entitled "Wells Fargo's

11   pressure-cooker sales culture comes at a cost."  It stated that "the relentless pressure to sell has . . .

12   led to ethical breaches . . . [t]o meet quotas, employees have opened unneeded accounts for

13   customers, ordered credit cards without customers' permission and forged client signatures on

14   paperwork."  *Id*. at ¶ 103.

15        Freeman alleges that "Los Angeles became known as the epicenter of simulated funding,

16   the most well-known aspect of the sales practice failures at Wells Fargo Bank."  *Id*. at ¶ 15.  She

17   alleges that the ethical problems disclosed in the *Los Angeles Times* articles "were matters of

18   extreme concern to Wells Fargo" and were discussed by senior management, but that "Wells

19   Fargo did not consider [Freeman] responsible for the simulated funding problems or for the

20   extreme pressure" referred to in the articles.  *Id*. at ¶¶ 104-05.

21        In May 2015, the City of Los Angeles sued Wells Fargo for alleged unfair and deceptive

22   sales practices at its Los Angeles branches from 2011-2015, a period that began over two years

23   after Freeman left the region.  *Id*. at ¶ 110.  Following the lawsuit, the Consumer Financial

24   Protection Bureau ("CFPB") and Office of the Comptroller of the Currency ("OCC") opened

25   investigations and found improper sales practices at the Community Bank.  *Id*. at ¶¶ 112-16.

26   Freeman was not accused of any wrongdoing by Wells Fargo, the City of Los Angeles, CFPB, or

27   OCC in connection with the lawsuit or investigations.  *Id*. at ¶ 117.  In September 2016, Wells

28   Fargo agreed to pay a total of $185 million in settlements with the City of Los Angeles, CFPB,

United States District Court
Northern District of California

1    and OCC.  *Id*. at ¶¶ 125-28.  Wells Fargo also agreed to take remedial actions.  Freeman "was

2    enlisted to join the executive working group which was tasked with setting up the consent order

3    implementation process."  *Id*. at ¶¶ 129-30.

4        In September 2016, the Wells Fargo Board of Directors formed an "Oversight Committee"

5    to internally investigate whether and when the Board and senior management knew about the

6    improper sales practices.  It hired Shearman & Sterling to conduct the investigation.  *Id*. at ¶¶ 133-

7    34.  Wells Fargo shareholders then filed a lawsuit against the Board of Directors and certain

8    executives in the United States District Court for the Northern District of California, alleging

9    breach of fiduciary duties and other claims.  *Id*. at ¶¶ 132; *see In re Wells Fargo & Co.*

10   *Shareholder Derivative Litig*., No. 4:16-cv-05541-JST (N.D. Cal. filed Sept. 29, 2016).

11       On February 21, 2017, Wells Fargo told Freeman that she was "being terminated 'for

12   cause'" without explanation.  Compl. ¶ 138.  On the same day, Wells Fargo issued a press release

13   containing the following statement: Wells Fargo "today announced employment terminations

14   based on its Board of Directors' ongoing independent investigation into the Company's retail

15   banking sales practices and related matters.  Four current or former senior managers in

16   Community Banking have been terminated by the Company for cause by a unanimous vote of the

17   Board."  The press release identified Freeman as one of the four terminated individuals.  *Id*. at ¶¶

18   139-40.  Freeman alleges that "[t]here was no cause for [her] termination" and the statement that

19   she "was fired 'for cause' was false and defamatory."  *Id*. at ¶ 141.

20       Also on February 21, 2017, Wells Fargo's CEO Tim Sloan "maliciously and falsely stated

21   that [Freeman] was one of the individuals responsible for improper sales practices which occurred

22   in Los Angeles."  *Id*. at ¶ 142.  Freeman alleges Sloan's statements "were false and defamatory."

23   *Id*.

24       On April 10, 2017, Wells Fargo's Board of Directors released the results of its

25   investigation in a Board Report, which "was replete with defamatory statements concerning

26   [Freeman]."  Compl. ¶ 147.  The complaint sets forth a number of statements that Freeman alleges

27   were defamatory.  She further asserts that even where statements did not specifically identify

28   Freeman, readers understood that they referred to Freeman based on "context and circumstances."

The challenged statements are:

> Over time, even as senior regional leaders challenged and criticized the increasingly unrealistic sales goals - arguing that they generated sales of products that customers neither needed nor used - the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization. This was especially true in areas where bad practices tended to disproportionately cluster, like Los Angeles and Arizona. Senior bankers there were particularly associated with extreme pressure, in some cases calling their subordinates several times a day to check in on sales performance and chastising those who failed to meet sales objectives. Certain managers also explicitly encouraged their subordinates to sell unnecessary products to their customers in an effort to meet the Community Bank's sales goals.

> Also, growing out of this investigation, on February 21, 2017, the Board announced the termination for cause of four officers within the Community Bank: its Group Risk Officer, its Head of Strategic Planning and Finance, who was primarily responsible for overseeing the sales goals and incentive system, and two senior regional banking leaders who had headed Los Angeles and Arizona and who encouraged and deployed especially improper and excessive sales practices. In doing so, the Board accorded credit to and treated differently other senior Community Bank leaders who made reasonable, good faith efforts to challenge and escalate concerns over sales goals and conduct.

> California and Arizona in particular consistently ranked among the top states for sales practice problems, in part based on sales pressure tactics encouraged by certain regional managers.

> Los Angeles experienced a disproportionately high rate of sales integrity issues over time, and certain leaders in Los Angeles were associated with creating a high-pressure environment. Witnesses consistently described Shelley Freeman - who was Regional President in Los Angeles until 2009, then became the Lead Regional President in Florida until 2013 - as an aggressive sales manager who created significant sales pressure. For instance, Freeman authored her own "motivator" emails, which featured her team's ranking on the Community Bank's "Motivator" and strongly emphasized the importance of increasing sales and being number one.

> Witnesses also stated that Freeman suggested to subordinates that they encourage customers to sign up for products regardless of need.

> After the merger with Wachovia, Wells Fargo sent Freeman to Florida. She continued to impose significant sales pressure; according to one witness, she strongly emphasized the importance of hitting sales goals and tolerated increased low quality accounts - as did members of Community Bank senior leadership - as a consequence of striving for increased sales. As an example, by September 2012 the Rolling Funding Rate for Florida had dropped to approximately 71%, lower than the Rolling Fund Rate for the entire Community Bank, which had itself declined to approximately 77%.

1    *Id*. at ¶¶ 147-48.  Freeman alleges that the foregoing statements "were false and defamatory."  *Id*.

2    at ¶ 149.

3         Freeman filed this lawsuit on February 1, 2023 alleging three claims for relief: 1)

4    defamation; 2) violation of California Labor Code section 1050 *et seq*.; and 3) invasion of privacy.

5         Wells Fargo now moves pursuant to Rule 12(b)(6) and California's anti-SLAPP statute to

6    dismiss and/or strike the complaint.  Freeman opposes the motion.  [Docket No. 29.][2]

7    **II.     LEGAL STANDARDS**

8         **A.     Rule 12(b)(6)**

9         A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

10   the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

11   When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all

12   of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

13   (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or

14   there is an absence of "sufficient factual matter to state a facially plausible claim to relief."

15   *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

16   *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

17   2001)) (quotation marks omitted).  A claim has facial plausibility when a plaintiff "pleads factual

18   content that allows the court to draw the reasonable inference that the defendant is liable for the

19   misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged

20   must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of

21   a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing

22   *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir.

23   2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir.

24   2002).

25

26   _____

27   [2] Freeman's opposition contains 33 footnotes, many of which are lengthy.  Footnotes are rarely
     helpful or persuasive and are usually an attempt to get around page limits.  Going forward, the
28   court orders the parties to minimize their use of footnotes and restrict their content to matters that
     are truly tangential but helpful.

United States District Court
Northern District of California

**B.      California Anti-SLAPP Motions in Federal Court**

Known as the "anti-SLAPP" statute,[3] California Code of Civil Procedure section 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)).  The statute provides that a claim against an individual "arising from any act of that person in furtherance of the person's right of petition or free speech" under the U.S. or California constitutions "shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1).  The anti-SLAPP statute further provides that "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Code § 425.16(c).

Under California law, "[t]he analysis of an anti-SLAPP motion proceeds in two steps." *Barry v. State Bar of Cal.*, 2 Cal. 5th 318, 321 (2017).  First, the court determines whether the plaintiff's claims are directed at "an act in furtherance of protected expression." *Metabolife*, 264 F.3d at 840 (citing Cal. Civ. Proc. Code § 425.16(b)).  The moving defendant bears the burden of "identifying all allegations of protected activity, and the claims for relief supported by them." *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016).  The analysis proceeds to the second step "[i]f the court determines that relief is sought based on allegations arising from activity protected by the statute." *Id*.  At the second step, the burden shifts to the plaintiff to show a "reasonable probability of prevailing in its claims for those claims to survive dismissal." *Metabolife*, 264 F.3d at 840.  The plaintiff must demonstrate that "each challenged claim based on protected activity is legally sufficient and factually substantiated." *Baral*, 1 Cal. 5th at 396.

A district court sitting in diversity must apply the federal standard for such motions.  Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity apply state laws to matters of substance, but federal law governs matters of procedure.  *See Hanna v. Plumer*, 380 U.S. 460, 473 (1965).  Applying state anti-SLAPP laws in federal court raises unique

---

[3] "SLAPP" is an acronym for "strategic lawsuit against public participation."

considerations because many anti-SLAPP provisions are procedural and therefore may conflict with the Federal Rules of Civil Procedure.  In *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 890 F.3d 828, 833 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018), the Ninth Circuit discussed one such tension between California's anti-SLAPP law and federal procedure.  When a defendant files an anti-SLAPP motion in California state court, "[a]ll discovery proceedings in the action" are stayed and the discovery stay "remain[s] in effect until notice of the entry of the order ruling on the motion."  *See* Cal. Code Civ. Proc. § 425.16(g). However, in federal court, "[r]equiring a presentation of evidence without accompanying discovery would improperly transform the motion to strike . . . into a motion for summary judgment without providing any of the procedural safeguards that have been firmly established by the Federal Rules of Civil Procedure."  *Planned Parenthood*, 890 F.3d at 833-34.  The court held that preserving the discovery stay aspect of section 425.16 "would effectively allow the state anti-SLAPP rules to usurp the federal rules" and that the court cannot "properly allow such a result."  *Id.* at 834.  Accordingly, *Planned Parenthood* set forth the standard that district courts must now apply in evaluating anti-SLAPP motions:

> If a defendant makes an anti-SLAPP motion to strike founded on purely legal arguments, then the analysis is made under [Rule] 8 and 12 standards; if it is a factual challenge, then the motion must be treated as though it were a motion for summary judgment and discovery must be permitted.

*Id.* at 833 (quoting *Z.F. v. Ripon Unified School District*, 482 Fed. App'x 239, 240 (9th Cir. 2012)).  For purely legal challenges, there is no need for the party opposing the motion to "submit evidence showing the merit of their claims."  *Id.* at 834.  For factual challenges, "discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court."  *Id.*

Here the parties agree that Wells Fargo's motion raises only legal challenges to the claims. *See* Mot. 7, 10; Opp'n 7.  Accordingly, the court must evaluate the motion under Rule 12(b)(6) and consider whether the claims are "properly stated."  *Planned Parenthood*, 890 F.3d at 834; *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021) ("A defendant may move to strike 'on purely legal arguments,' in which case we analyze the motion pursuant to Rules 8 and

1   12.").

2          If the court finds deficiencies in the claims as pleaded, it may defer consideration of the

3   anti-SLAPP motion pending the filing of an amended complaint.  *Verizon Delaware, Inc. v. Covad*

4   *Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) (noting that "granting a defendant's anti-

5   SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend

6   would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment"; holding

7   district court did not err in deferring consideration of anti-SLAPP motion pending receipt of an

8   amended complaint and affirming denial of anti-SLAPP motion to strike original complaint).

9   **III.    REQUEST FOR JUDICIAL NOTICE**

10          Wells Fargo asks the court to take judicial notice of four documents: 1) the April 10, 2017

11  Independent Directors of the Board of Wells Fargo & Company's Sales Practices Investigation

12  Report (the "Board Report"); 2) the February 21, 2017 Wells Fargo press release entitled, "Wells

13  Fargo Announces Actions Based on Retail Banking Sales Practices Investigation" (the "Press

14  Release"); 3) a February 6, 2018 decision by the Honorable Richard Rico granting an anti-SLAPP

15  motion in *Razzaghipour v. Wells Fargo Bank NA*, No. BC674303, Superior Court of California,

16  County of Los Angeles; and 4) Freeman's Financial Industry Regulation Authority ("FINRA")

17  "BrokerCheck Report."  [Docket Nos. 20-1 (Request for Judicial Notice, "RJN"); 21 (McGimsey

18  Decl. Mar. 31, 2023) Exs. A-D.]  Freeman does not oppose Wells Fargo's request for judicial

19  notice.

20          The Board Report and Press Release are discussed in the complaint but are not attached to

21  it.  *See, e.g.*, Compl. ¶¶ 139-41, 146-49.  It is appropriate to consider them under the incorporation

22  by reference doctrine.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir.

23  2018) (incorporation by reference is appropriate "if the plaintiff refers extensively to the document

24  or the document forms the basis of the plaintiff's claim.").

25          As to the decision in *Razzaghipour* and the FINRA BrokerCheck Report, the request for

26  judicial notice is denied as moot as the court did not rely on these materials in reaching its

27  decision on the motion.

28

United States District Court
Northern District of California

## IV.   DISCUSSION

As noted, the parties agree that the current motion raises only legal challenges to Freeman's claims and neither party submitted evidence for the court's consideration.  *See* Mot. 7, 10; Opp'n 7.  Accordingly, "the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies."  *See Planned Parenthood*, 890 F.3d at 834 (quotation marks and citation omitted).  Therefore, the court first considers whether the complaint states claims for defamation, California Labor Code section 1050 *et seq.*, and invasion of privacy under Rule 12(b)(6) and then turns to the anti-SLAPP motion.

### A.  Rule 12(b)(6)

#### 1.  Defamation

Freeman's defamation claims are based on 1) the statement in the February 21, 2017 Press Release announcing her termination "for cause" in connection with the Board of Directors' "ongoing independent investigation"; 2) the statement by Sloan during a February 21, 2017 phone call that Freeman "was one of the individuals responsible for improper sales practices which occurred in Los Angeles"; and 3) statements about Freeman in the April 10, 2017 Board Report. *See* Compl. ¶¶ 139-42, 146-49; Opp'n 5-6 (specifying the three "act[s] of defamation").

Wells Fargo argues that Freeman's defamation claims fail for the following reasons: 1) the complaint does not plead the allegedly defamatory statement by Sloan during the February 21, 2017 phone call with adequate specificity; 2) statements in the Board Report that do not mention Freeman or "refer to her by clear implication" cannot support a defamation claim; and 3) the complaint does not adequately allege the required element of falsity.  Mot. 11-13, 12 n.3.

##### a.  Elements of a Defamation Claim

Under California law, a plaintiff bringing a defamation claim must establish: "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage."  *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (quotation marks and citation omitted).  "Defamation is effected by" libel or slander.  Cal. Civ. Code § 44.  "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which

11

1    has a tendency to injure him in his occupation." Cal. Civ. Code § 45. "Slander is a false and

2    unprivileged publication, orally uttered . . . which . . . [t]ends directly to injure him in respect to

3    his office, profession, trade or business, either by imputing to him general disqualification in those

4    respects which the office or other occupation peculiarly requires, or by imputing something with

5    reference to his office, profession, trade, or business that has a natural tendency to lessen its profits

6    . . ." Cal. Civ. Code § 46(3).

7            The court determines as a matter of law whether a statement is "reasonably susceptible of a

8    defamatory interpretation; if the statement satisfies this requirement, it is for the jury to determine

9    whether a defamatory meaning was in fact conveyed to the listener or reader." *Bently Reserve LP*

10   *v. Papaliolios*, 218 Cal. App. 4th 418, 428 (2013). In deciding whether a statement is reasonably

11   susceptible of a defamatory meaning, a court must use "a totality of the circumstances test" and

12   "put itself in place of an average reader and determine the natural and probable effect of the

13   statement." *ZL Techs., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624 (2017) (quoting *Bently Reserve*

14   *LP*, 218 Cal. App. 4th at 427-28). "[W]e look to what is explicitly stated as well as what

15   insinuation and implication can be reasonably drawn from the communication." *Issa v. Applegate*,

16   31 Cal. App. 5th 689, 703 (2019) (quoting *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980)).

17                            **b.**        **Analysis**

18                                   **i.** **Sloan's Statement During the February 21, 2017 Phone**
                                        **Call**

19

20           Wells Fargo argues that the complaint does not adequately plead the "specific words or

21   substance of the allegedly defamatory statements" by Sloan during the February 21, 2017 phone

22   call. Mot. 11. Not so. The complaint alleges that during the call, Sloan told Wells Fargo's

23   "senior leaders" that Freeman "was one of the individuals responsible for improper sales practices

24   which occurred in Los Angeles." Compl. ¶ 142. This allegation sufficiently identifies "the

25   substance of the allegedly defamatory statement." *See Indus. Waste & Debris Box Serv., Inc. v.*

26   *Murphy*, 4 Cal. App. 5th 1135, 1155 (2016) (to plead slander or libel claim "plaintiff must set

27   forth either the specific words or the substance of the allegedly defamatory statements" (internal

28   quotation marks and citations omitted)). Wells Fargo cites no authority for the proposition that

United States District Court
Northern District of California

more is required.[4]  The motion to dismiss is denied on this ground.

### ii.  Statements in the Board Report That Do Not Expressly Refer to Freeman

Wells Fargo argues in a footnote that "statements in the Board Report that make no mention of [Freeman] or do not refer to her by clear implication" cannot support a defamation claim.  Mot. 12 n.3.  Although it is not entirely clear, it appears that Wells Fargo challenges the following statement in the Board Report because it does not expressly refer to Freeman: "the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization.  This was especially true in areas where bad practices tended to disproportionately cluster, like Los Angeles and Arizona."  *See id.*; Compl. ¶ 147; Board Report 5.  Wells Fargo's argument on this point is not particularly well-developed.  It cites *SDV/ACCI, Inc. v. AT & T Corp.*, 522 F.3d 955, 959 (9th Cir. 2008), but offers little analysis.  In *SDV*, the Ninth Circuit stated that under California law, "whether statements can be reasonably interpreted as referring to plaintiffs is a question of law for the court" and "[i]f there is no express reference to the plaintiff in a defamatory statement, the claim will fail unless the statement refers to the plaintiff by reasonable implication."  522 F.3d at 959 (citations omitted).[5]

The court's evaluation of the argument is complicated by the fact that Freeman does not specifically respond to it in her opposition.  Instead, she describes "numerous false factual representations regarding purported unethical banking by Ms. Freeman" in the Board Report.  *See*

---

[4] Wells Fargo's sole authority on this point is distinguishable.  In *Donoho v. Cnty. of Sonoma*, No. 15-CV-01392-WHO, 2015 WL 3866228, at *6 (N.D. Cal. June 22, 2015), the court held that a complaint's allegations that an individual "made 'derogatory suggestions, statements, and/or innuendos that [the plaintiff] could not do the job or was not a good choice for the position for which she was a finalist' [were] too vague and lack[ed] the factual foundation necessary for a defamation claim."  The court held that "without alleging at least the substance of the allegedly defamatory statement, it cannot be determined whether the alleged statement is capable of sustaining a defamatory meaning and is not mere opinion protected by the First Amendment."  *Id.*  Wells Fargo does not argue that Sloan's statement is "mere opinion" or otherwise is not capable of "sustaining a defamatory meaning."

[5] Notably, the court in *SDV* did not actually decide whether the alleged defamatory statements about the plaintiffs' business "could reasonably be understood as referring to" the individual plaintiffs, who were the business's officers and shareholders.  Instead, the *SDV* court affirmed summary judgment on the alternative ground that there was no evidence that "any third party understood the statements as referring to [the individual plaintiffs] by implication."  522 F.3d at 959-60.

United States District Court
Northern District of California

Opp'n 6 n.9, 18-19; Compl. ¶¶ 147-48.  Wells Fargo does not address these representations in its reply, nor does it argue that those representations do not refer to Freeman "by reasonable implication" or otherwise clarify which particular statements it contends a reader would not reasonably understand to be about Freeman.  The court cannot analyze an argument that counsel fails to develop.  Accordingly, the motion on this point is denied.

### iii.  Falsity

Wells Fargo argues that the complaint does not adequately allege falsity with respect to the challenged statements.  Mot. 12.  First, Wells Fargo argues that the complaint does not allege "what constituted 'cause' under the terms of [Freeman's] employment" and accordingly "cannot establish that the statements concerning her 'for cause' termination were false," citing *Charney v. Standard General, L.P.*, 10 Cal. App. 5th 149, 158 (2017).  *Id.*

In *Charney*, the plaintiff brought a defamation claim against the defendant based on a statement in a press release about his termination.  The press release stated in relevant part, "[w]e supported the independent, third-party and very thorough investigation into the allegations against [the plaintiff], and respect the Board of Directors' decision to terminate him based on the results of that investigation."  *Id.* at 152.  The plaintiff argued that "the press release wrongly indicate[d] he was terminated for cause."  *Id.* at 158.  The court held that the plaintiff's claim that the press release was defamatory had no merit because it "does not articulate *why* [the plaintiff] was terminated."  *Id.* (emphasis in original).  Specifically, the press release did not "state the underlying reasons" for the termination or state "the specific factual findings of [the] investigation."  Therefore, the statement about the plaintiff's termination could not "be proven false as it does not state that [the plaintiff] engaged in criminal conduct or that his conduct violated certain standards, or even that there existed any particular conduct that caused his termination."  *Id.*

In contrast with the press release at issue in *Charney*, the February 21, 2017 Press Release actually stated that Freeman's termination was "for cause."  Moreover, it specified that the termination was "based on [Wells Fargo's] Board of Directors' ongoing independent investigation into the Company's retail banking sales practices and related matters."  *See* Compl. ¶¶ 139-40.

United States District Court
Northern District of California

The Press Release also stated that none of the terminated executives, including Freeman, "will receive a bonus for 2016 and they will forfeit all of their unvested equity awards and vested outstanding options."  Press Release.  Considering "both the language of the statement and the context in which it [was] made," as well as the totality of the circumstances, *ZL Techs.*, 13 Cal. App. 5th at 624, the court concludes that the statement that Freeman was terminated "for cause" is reasonably susceptible to a defamatory interpretation; that is, that the investigation following the sales practices scandal had shown that Freeman was responsible for misconduct that justified her termination, the loss of her bonus, and her forfeiture of equity and stock options.  "[W]hether a defamatory meaning was in fact conveyed to the listener or reader" is a question of fact.  *See Bently Reserve*, 218 Cal. App. 4th at 428.  A reasonable juror could find that the statement that Freeman was terminated for cause implies that she was responsible for misconduct related to the retail banking sales practices scandal.

Wells Fargo's second argument regarding falsity is that the complaint's allegations "do not preclude [Freeman] from bearing some responsibility for the sales practices issues" and thus do not adequately allege falsity.  Mot. 12-13.  For example, Wells Fargo notes that allegations about other employees' misconduct say nothing about Freeman's own culpability and argues that positive performance reviews "do not preclude the Bank from later determining that [Freeman] was in fact responsible for sales practices misconduct" during the relevant time period.  *Id*. at 13.  It also contends that allegations that Freeman complained to management about policies that incentivized sales practices misconduct do not "mean that sales practices misconduct was not allowed to flourish under her watch."  *Id*.

These arguments go to the merits of the claim and are not persuasive at the pleading stage.  In addition to expressly alleging that the challenged statements were false, *see* Compl. ¶¶ 141, 142, 147-49, the complaint contains extensive allegations challenging the results of the Board of Directors' investigation.  These include allegations about the Board's motives and objectives and "scapegoat[ing]" Freeman to protect others and the Board's disregard of documents demonstrating Freeman's "high ethical standards," "documented opposition to low quality accounts and her zero tolerance for unethical behavior," and "escalations to more senior management . . . concerning

15

sales goals, sales integrity, sales pressure, and incentive compensation plans." *Id*. at ¶¶ 152-54. The complaint also alleges that Wells Fargo knew or should have known that simulated funding problems that came to light more than four years after Freeman left the Los Angeles region "were not and could not have been caused by [her] actions," challenges the Board's conclusions about who was responsible, and disputes whether the Board investigated the prior anonymous complaints, including complaints about a different manager (Sotoodeh). *Id*. at ¶¶ 156-65.  Further, the complaint alleges that statements in the Board Report about Freeman were "malicious and reckless" for numerous reasons, including the Board's failure to interview Freeman, consider her employment history, interview her subordinates, or "review and consider the vast amount of documentary evidence" supporting Freeman; acceptance of "self-serving statements" by others who blamed Freeman; use of erroneous statistics; and cherry picking "points in time to smear" Freeman. *Id*. at ¶ 167.

These allegations sufficiently plead falsity, where the court must accept the allegations as true and construe all factual inferences in the light most favorable to Freeman.  *See Iqbal*, 556 U.S. at 678.  Wells Fargo's arguments go to the merits of the allegations that the challenged statements were false, but Freeman is not required to prove her defamation claim at this stage.  The court concludes that the complaint adequately alleges falsity and denies the motion to dismiss the defamation claims.

### 2.        California Labor Code section 1050

California Labor Code section 1050 provides that "[a]ny person, or agent or officer thereof, who, after having discharged an employee from the service of such person . . . by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor."  Any person who "violates any provision of [California Labor Code] sections 1050 to 1052 . . . is liable to the party aggrieved, in a civil action, for treble damages." Cal. Lab. Code § 1054.  In her opposition, Freeman clarifies that this claim is based only upon statements in the February 21, 2017 press release and the April 10, 2017 Board Report. Opp'n 21.

Wells Fargo argues that Freeman cannot state a claim under these provisions because they

1    only apply to "California wage earner[s]," citing California Labor Code section 50.5, which states

2    that "[o]ne of the functions of the Department of Industrial Relations is to foster, promote, and

3    develop the welfare of the wage earners of California, to improve their working conditions, and to

4    advance their opportunities for profitable employment." Mot. 14.  Wells Fargo points to the

5    allegations that Freeman has been a resident of Florida since 2009; was employed in Florida when

6    she was terminated; and lived and worked in Florida when the challenged statements were made.

7    *Id*. (citing *Fisher v. CRST Van Expedited Inc*, No. EDCV 15-878-VAP (SPX), 2016 WL

8    11523407, at *6-7 (C.D. Cal. May 4, 2016)).  It also contends that there is a "strong presumption

9    against the extra-territorial application of California law" and that the complaint fails to plead facts

10   to overcome this presumption.  Mot. 15.

11        As an initial matter, nothing in sections 1050 or 1054 limit their application to in-state

12   plaintiffs, and Wells Fargo cites no authority for that proposition.  Moreover, "[u]nder California

13   law, the relevant inquiry for whether state law should be applied extraterritorially is not the

14   location of employment or where the contract was formed, but rather whether 'the conduct which

15   gives rise to liability . . . occurs in California.'"  *Fisher*, 2016 WL 11523407, at *6 (quoting

16   *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (1999)) (holding Cal.

17   Lab. Code § 1050 "applies when an out-of-state employer interferes with a former employee's

18   prospective employment in California").  "[T]he presumption against extraterritoriality does not

19   apply when the underlying conduct largely occurred within California."  *Deirmenjian v. Deutsche*

20   *Bank, A.G.*, No. CV 06-00774 MMM CWX, 2006 WL 4749756, at *35 (C.D. Cal. Sept. 25, 2006)

21   (citing *Diamond*, 19 Cal. 4th at 1059-60).

22        Here, the "underlying conduct" is the statements about Freeman in the February 1, 2017

23   Press Release and the April 10, 2017 Board Report.  The complaint alleges that the Press Release

24   was issued in San Francisco, Compl. ¶ 139, and that Wells Fargo's principal place of business is in

25   San Francisco.  *Id*. at ¶ 2.  The complaint further alleges that "a substantial part of the events

26   giving rise to the claim, including actions taken by Wells Fargo, occurred in this judicial district"

27   and that the Board Report defamed Freeman "worldwide," which includes California.  *Id*. at ¶¶ 6,

28   146.  These allegations sufficiently allege that "the conduct which gives rise to liability . . .

17

1    occur[red] in California."

2    Wells Fargo next argues that the complaint fails to state a claim under section 1050

3    because it does not allege that Wells Fargo made the statements at issue to a "prospective

4    employer" or that it made them "with the intent to prevent [Freeman] from obtaining

5    employment."  Mot. 15.

6    In order to establish a claim under section 1050, a plaintiff must establish that 1) after the

7    plaintiff's employment with a defendant ended, the defendant made a representation to a

8    prospective employer about the plaintiff; 2) the representation was not true; 3) the defendant knew

9    the representation was not true when it was made; 4) the defendant made the representation with

10   the intent of preventing the plaintiff from obtaining employment; 5) the plaintiff was harmed; and

11   6) the defendant's conduct was a substantial factor in causing the plaintiff's harm.  *See* CACI No.

12   2711; *Spann v. C.R. England, Inc*, No. EDCV 18-1425 JGB (SPX), 2018 WL 6198469, at *7

13   (C.D. Cal. Oct. 24, 2018).  Courts have held that section 1050 claims sound in fraud and must

14   meet the heightened pleading standards of Rule 9(b), which requires a party to "state with

15   particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  *See Spann*,

16   2018 WL 6198469, at *7 (citing *Fimbres v. Pac. Mar. Ass'n*, No. CV 11-6785 CAS PJWX, 2012

17   WL 6193253, at *6 (C.D. Cal. Dec. 10, 2012)).

18   Freeman does not dispute these elements or Rule 9(b)'s application to the claim.  *See*

19   Opp'n 21.  As to intent, she argues that "[w]hen Wells Fargo told the world that Ms. Freeman was

20   an unethical banker, it knew that unemployment in the banking field was certain to follow" and

21   thus the element of intent is satisfied.  *Id.*  In support, she cites *Marich v. MGM/UA*

22   *Telecommunications, Inc.*, 113 Cal. App. 4th 415, 422 (2003), in which the court set forth a

23   definition of "intent" from the Restatement that it noted was "used widely in civil actions":

24   "[i]ntent is not . . . limited to consequences which are desired.  If the actor knows that the

25   consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is

26   treated by the law as if he had in fact desired to produce the result."  Freeman does not expressly

27   address Wells Fargo's argument that the claim does not allege that the statements were made to "a

28   prospective employer."  *See* Opp'n 21.

United States District Court
Northern District of California

United States District Court
Northern District of California

Wells Fargo responds that this is "insufficient as a matter of law," citing *Elettronica GmBH v. Radio Frequency Simulation Sys., Inc.*, No. SACV 16-01523 AG (KESX), 2018 WL 1942562, at *6 (C.D. Cal. Feb. 26, 2018), in which the court granted summary judgment on a section 1050 claim where there was no evidence that a challenged communication about the circumstances of a company's closure was sent "to prevent or attempt to prevent [the company's president] from obtaining employment" and there was "almost no connection to [that individual's] employment." However, *Elettronica* is clearly distinguishable from the statements at issue in this case that were expressly about Freeman's employment.

Given the circumstances of the challenged statements—made in a press release following a significant banking scandal and in a Board Report "disseminated worldwide"—the court concludes that the complaint's allegations support a reasonable inference that Wells Fargo made the statements with the knowledge that they would likely prevent Freeman from obtaining employment, at least in the banking field. Although it is far from clear whether Freeman will ultimately be able to establish this claim, the court concludes that the complaint states a section 1050 claim. The motion to dismiss the claim is denied.

### 3.    Invasion of Privacy

Freeman's third and final claim is for invasion of her "constitutional right to privacy." Compl. 43, ¶ 194.

Wells Fargo moves to dismiss Freeman's invasion of privacy claim under the California Constitution on the ground that she was not a California resident at the time Wells Fargo made the challenged statements. It argues that the California Constitution sets forth rights "intended to protect Californians, not non-residents" such as Freeman. Mot. 16. *See Buzayan v. City of Davis*, 927 F. Supp. 2d 893, 902-03 (E.D. Cal. 2013) ("The California Constitution, at Article I, section 1, includes privacy as among the inalienable rights guaranteed to its residents."). It then goes on to argue that even if Freeman can bring a privacy claim under the California Constitution as an out-of-state resident, the complaint fails to state such a claim. Mot. 17-18.

Wells Fargo then moves to dismiss a separate claim for the tort of public disclosure of private facts under California law. Mot. 19. This is presumably because the section of the

1  complaint corresponding to the invasion of privacy claim alleges that Wells Fargo made a "public

2  disclosure of . . . private alleged facts regarding [Freeman's] performance," but there is no

3  indication that the complaint seeks to allege public disclosure of private facts as a separate claim.

4  *See* Compl. 43-44.

5       Freeman's opposition does little to clear up the confusion about the basis for her privacy

6  claim.  First, she argues that out-of-state plaintiffs may assert privacy claims under the California

7  Constitution but cites only cases in which plaintiffs in other states brought such claims and there

8  was no analysis of the propriety of doing so.  Opp'n 22, 23 (citing, e.g., *Williams v. Facebook,*

9  *Inc.*, 498 F. Supp. 3d 1189, 1192 (N.D. Cal. 2019) (noting that plaintiffs "are consumers from the

10  states of New York, Kansas, Texas, and Florida who bring claims against Facebook, Inc. for

11  violations of . . . California's constitutional right to privacy").[6]  In other words, Freeman's cited

12  authority does not actually grapple with this dispute.  Freeman's opposition also does not address

13  the elements of an invasion of privacy claim under the California Constitution.

14       Freeman then argues that "[a] common law privacy right predated California's

15  constitutional privacy right" and contends that such a claim requires two elements: "[f]irst, the

16  defendant must intentionally intrude into a . . . matter as to which the plaintiff has a reasonable

17  expectation of privacy.  Second, the intrusion must occur in a manner highly offensive to a

18  reasonable person."  Opp'n 22 (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009)).

19  These are the elements of a claim for "[a] privacy violation based on the common law tort of

20  intrusion."  *Hernandez*, 47 Cal. 4th at 286.  As an initial matter, the complaint does not clearly

21  state such a claim or otherwise put Wells Fargo on notice that it alleges such a claim; the words

22  "intrusion" or "intrude" do not appear anywhere in the complaint.  Moreover, it is not clear that

23  such a claim is applicable in these circumstances, since the first element of the tort of intrusion,

24  that "the defendant must intentionally intrude into a place, conversation, or matter as to which the

25  plaintiff has a reasonable expectation of privacy," requires the plaintiff to show that the defendant

26  "penetrated some zone of physical or sensory privacy . . . or obtained unwanted access to data by

27  

28  [6] Confusingly, Freeman cites authority for the proposition that she may invoke California
constitutional protections several paragraphs after making that assertion.  *See* Opp'n 22-23.

electronic or other covert means, in violation of the law or social norms." *Id.* The complaint does not allege facts supporting this element, and Freeman cites no authority involving common law intrusion claims based on similar facts.

In sum, the basis for Freeman's invasion of privacy claim is not clearly pleaded. Accordingly, the claim is dismissed with leave to amend. Any amended privacy claim must clearly indicate the specific basis for the claim, whether it be the California Constitution and/or common law and allege facts to support the necessary elements of the claim(s).

### B.   Anti-SLAPP

Wells Fargo moves to strike all of Freeman's claims pursuant to the anti-SLAPP statute. As previously noted, the motion brings a purely legal challenge and is therefore analyzed under Rule 12(b)(6). *Planned Parenthood*, 890 F.3d at 834; *Herring Networks, Inc.*, 8 F.4th at 1155. The court has determined that the complaint adequately states defamation and California Labor Code section 1050 claims. Thus, Wells Fargo has failed to meet one of the two prongs required by the anti-SLAPP statute. *See Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011) (a claim is only subject to being stricken under the anti-SLAPP statute if it both arises from protected speech and "lacks minimal merit"). The court therefore denies the anti-SLAPP motion without reaching the other prong–namely, whether the claims arise from protected speech.

Given that the dismissal of the privacy claim is with leave to amend, the court denies the anti-SLAPP motion and corresponding request for attorneys' fees and costs pursuant to California Code of Civil Procedure section 425.16 without prejudice at this time. If Freeman files an amended complaint alleging a privacy claim, Wells Fargo may renew its anti-SLAPP motion as to that claim if appropriate. *See, e.g., Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 820 (N.D. Cal. 2019) (denying anti-SLAPP motion and request for fees without prejudice pending filing of second amended complaint); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1231 n.1 (N.D. Cal. 2014) (same).

### V.   CONCLUSION

For the foregoing reasons, Wells Fargo's motion to dismiss is granted with leave to amend as to Freeman's invasion of privacy claim but is otherwise denied. The anti-SLAPP motion

directed to the defamation and section 1050 claims is denied.  The anti-SLAPP motion is denied without prejudice with respect to the invasion of privacy claim.  Any amended complaint must be filed within 14 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: July 26, 2023



Donna M. Ryu
Chief Magistrate Judge